UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                      :

IN RE VITAMIN C ANTITRUST LITIGATION   :    06-MD-1738 (BMC) (JO)

------------------------------------------------------------ :
                                      :

This document relates to:                :   **MEMORANDUM**
                                      :   **DECISION AND ORDER**
ALL CASES                            :

                                      :
------------------------------------------------------------X

**COGAN,** District Judge.

        This litigation arises out of allegations that a group of Chinese vitamin C manufacturers

conspired to fix the price of vitamin C at non-competitive levels and to limit the supply of

vitamin C for export to the United States. One of the defendant manufacturers, Aland (Jiangsu)

Nutraceutical Co., Ltd ("Aland"), entered into two settlement agreements with certain plaintiff

classes which the Court preliminarily approved on June 13, 2012. Since then, notice of the

settlements has been sent to members of the plaintiff classes and objections have been received.

On October 17, 2012, the Court held a fairness hearing on the settlements as well as plaintiffs'

counsels' requests for fees and expenses.

        Plaintiffs have moved for final approval of the Aland settlement agreements and for

attorneys' fees and expenses. The Court held a fairness hearing and granted the motions on the

record. This decision sets forth the basis for that ruling.

## BACKGROUND

        Aland's first settlement agreement was struck with the two certified classes in this

litigation, the Direct Purchaser Damages Class and the Injunction Class (collectively, the

"Certified Classes"). The Direct Purchaser Damages Class consists of persons and entities who

directly purchased vitamin C products for delivery in the United States, other than by contract containing an arbitration clause, from any of defendants or their co-conspirators, other than Northeast Pharmaceutical Group Co. Ltd., between December 1, 2001 and June 30, 2006. The Ranis Company, Inc., ("Ranis") is the sole representative of the Direct Purchaser Damages Class and plaintiffs estimate that there are approximately 150 members of this class. The Injunction Class is comprised of all persons and entities who purchased vitamin C products manufactured by defendants for delivery in the United States, whether directly from a defendant or through an intermediary, other than by contract with an arbitration clause, from December 1, 2001 to the present. Animal Sciences Products, Inc., ("Animal Sciences") is the sole representative of the Injunction Class and plaintiffs estimate that there are millions of members of this class. In exchange for a release of the Certified Classes' claims against Aland under the antitrust laws, Aland agreed to pay $9.5 million into a settlement fund for members of the Direct Purchaser Damages Class and to comply with any injunction under Section 1 of the Sherman Act that the Court enters against any other defendants in this litigation

Aland also entered a settlement agreement with a non-certified group of indirect vitamin C purchasers. In connection with granting plaintiffs' motion for preliminary approval of the settlements, the Court certified a class of indirect purchasers for settlement purposes (the "Indirect Purchaser Damages Settlement Class"), which encompassed all persons and entities residing in a Settling Jurisdiction[1] who indirectly purchased vitamin C products for use or consumption, but not for resale, from within a Settling Jurisdiction between December 1, 2001 and June 30, 2006. In exchange for a release of the Indirect Purchaser Damages Settlement

---

[1] The Settling Jurisdictions are Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

Class' claims against Aland under the antitrust laws, Aland agreed to pay $1 million into a settlement fund.

After granting plaintiffs' motion for preliminary approval of the settlements, the Court also approved plaintiffs' proposed class notice plan, subject to certain modifications. Pursuant to this plan, a copy of the settlement notice was mailed to every potential member of the Direct Purchaser Damages Class whose address was provided by defendants. The notice that was ultimately mailed to 147 members of this class also contained a claim form. Additionally, the class notice was published in eight print publications, as well as on Facebook and on the approximately 800 websites that comprise the 24/7 Network. Finally, the settlement notice, along with other lawsuit and settlement-related information, was made available on a website operated by the settlement administrator.

The notice provided to class members contained descriptions and explanations of the lawsuit, the classes, the settlements, the methods of distributing the settlement funds, class counsel's intent to seek fee awards, and class members' rights. Members of both the Direct Purchaser Damages Class and the Indirect Purchaser Damages Settlement Class were afforded an opportunity to exclude themselves from the settlement classes by submitting exclusion requests. Additionally, members of all the settlement classes were given the opportunity to object to the settlement and appear at the fairness hearing.

The Court received written objections from only three putative members of the Indirect Purchaser Damages Settlement Class. The objections all challenged the planned allocation of the class' $1 million settlement fund. The class notice provided that, "because there are millions of class members of the Indirect Purchaser Damages Class, a direct cash distribution to Indirect Purchaser Damages Class members is not practical. Instead, settlement funds will be distributed

3

on behalf of the Indirect Purchaser Damages Class to charitable, not-for-profit, or governmental organizations approved by the Court." The objectors argued that it was too early to determine whether a direct cash distribution to class members was, in fact, "impractical," and suggested that a settlement administrator would be able to make such a distribution. The objectors also complained of the lack of notice regarding the *cy pres* distribution of the settlement fund to a charity, in that the class notice did not identify any potential recipient organizations. Plaintiffs explained, however, in their motion for final approval of the settlement, that they intend to keep the Indirect Purchaser Damages Class settlement fund in an interest-bearing escrow account until the total recovery in the litigation from all defendants, whether by settlement or judgment, is determined and to distribute the total funds going to indirect purchasers to a Court-approved organization only at that point.

No class members or objectors appeared at the fairness hearing on October 17, 2012. The Court questioned counsel for the settlement classes on the substance of the written objections, as well as other matters related to the proposed settlements and fee requests.

## DISCUSSION

### I. The Settlement Agreements

The claims of a certified class may only be settled subject to court approval. Fed. R. Civ. P. 23(e). Before approving a settlement, a court must conclude that the settlement is "fair, adequate, and reasonable, and not a product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000). Trial courts have discretion in granting or denying approval, but "that discretion should be exercised in light of the general policy favoring settlement." In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 509 (E.D.N.Y. 2003). A court "determines a settlement's fairness by looking at both the settlement's terms and the negotiating

process leading to the settlement." <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 116 (2d Cir. 2005). Where "a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery[,]" courts in the Second Circuit presume fairness, adequacy, and reasonableness. <u>Id.</u> For the reasons discussed, the Court concludes that the settlement agreements for the Certified Classes and the Indirect Purchaser Damages Settlement Class are fair, reasonable, and adequate.

A.    <u>Procedural Fairness</u>

The circumstances surrounding the settlement of both the Certified Classes' and the Indirect Purchaser Damages Settlement Class' claims support a finding that the settlements are procedurally fair. <u>See</u> <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."). <u>See also</u> <u>In re Holocaust Victim Assets Litig.</u>, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) ("The [negotiation] process must be examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves.") (internal quotation marks omitted).

Here, discovery was largely completed in 2008, years before plaintiffs and Aland reached agreement on settlements, affording the parties the opportunity to analyze the disputed legal and factual issues prior to commencing settlement negotiations. Aland's counsel and counsel for the Certified Classes began discussing settlement in February 2012 and reached an agreement in principle to settle in April 2012. During that time, counsel exchanged correspondence, engaged in phone calls, and participated in in-person meetings. After an agreement in principle was reached, the parties negotiated other terms of the settlement for a month before signing the

5

settlement agreement for the Certified Classes. There is no indication that the Certified Class settlement is the product of collusion. Moreover, based on its familiarity with the attorneys for the Certified Classes and the conduct of this litigation, the Court is satisfied that counsel are highly experienced at class action and antitrust litigation and that they have prosecuted this case with vigor.

Similarly, counsel for Aland and counsel for the Indirect Purchaser Damages Class engaged in settlement discussions beginning in March 2012. Plaintiffs represent that these discussions "were always at arm's length and non-collusive" and there is no indication otherwise. The parties reached an agreement in principle to settle in April 2012 and continued to negotiate other settlement terms before signing the settlement agreement on May 16, 2012. All three firms representing the Indirect Purchaser Damages Class have substantial experience in class action litigation, including antitrust class actions. In light of these facts, the Court concludes that the instant settlement agreements satisfy the procedural fairness requirement.

B.     Substantive Fairness

Courts in the Second Circuit evaluative the substantive fairness, adequacy, and reasonableness of a settlement according to the factors set out in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974). See also Wal-Mart, 396 F.3d at 117. The Grinnell factors are:

   (1) the complexity, expense and likely duration of the litigation;

   (2) the reaction of the class to the settlement;

   (3) the stage of the proceedings and the amount of discovery completed;

   (4) the risks of establishing liability;

   (5) the risks of establishing damages;

6

(6) the risks of maintaining the class action through trial;

(7) the ability of defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (internal citations omitted). In order to approve a settlement, a court need not conclude that all of the Grinnell factors weigh in favor of the settlement. Instead a court "should consider the totality of these factors in light of the particular circumstances." Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

### 1. *Complexity, Expense and Likely Duration of Litigation*

Courts recognize that "[f]ederal antitrust cases are complicated, lengthy, and bitterly fought[,]" Wal-Mart, 396 F.3d at 118, as well as costly. See Park v. Thomson Corp., No. 05 Civ. 2931, 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008). This litigation has been pending since 2005 and has involved the production of thousands of documents, at least 17 fact witness depositions, expert discovery, and extensive motion practice. The Certified Classes are scheduled for a trial against the non-settling defendants that is expected to take at least three weeks. Aside from the settlement class, no indirect purchaser class has been certified and proceedings in those actions can be expected to continue for some time. Consequently, this factor favors a finding that the settlements are fair.

### 2. *Reaction of the Class to the Settlement*

The Court is not aware of any objections to or exclusions from the settlement for the Certified Classes. As to the Indirect Purchaser Damages Settlement Class, the Court has received three objections out of millions of potential class members. This suggests that the

reaction from the classes is positive on the whole. See Park, 2008 WL 4684232. See also In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d at 511 ("The extremely small number of objectors . . . heavily favors approval.").

Further, the Court is satisfied that plaintiffs have largely addressed the concerns raised by the objectors. As discussed further below, three members of the Indirect Purchaser Damages Settlement Class have objected to the *cy pres* distribution of the settlement fund. Counsel's plan to postpone identifying a *cy pres* recipient until the full amount to be distributed to indirect purchasers is known will assist the Court in its determination of how to make distribution of these funds that is consistent with the interests of the class.

### 3. *Stage of Proceedings and Amount of Discovery Completed*

This Grinnell factor "is intended to assure the Court that counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them." In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 458 (S.D.N.Y. 2004) (internal quotation marks omitted). "Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims." Id. Here, at the time Aland reached agreement with the settlement classes, discovery had been substantially complete for years and a number of motions, including motions to dismiss, class certification motions, and summary judgment motions had been decided. The Court concludes that the parties had a thorough understanding of their positions in this litigation at the time they agreed to settle and that this factor favors a finding that the settlements are fair.

### 4. *Litigation Risks*

The fourth, fifth, and sixth Grinnell factors all relate to continued litigation risks. Needless to say, there is a risk that defendants will prevail on a liability point at trial of the

8

Certified Classes' claims, such as by establishing foreign sovereign compulsion as a matter of fact or mounting a successful defense to damages. There is also the risk that a post-trial motion or appeal could result in a determination that comity or sovereign immunity bar this action as a matter of law. In addition, indirect purchasers may experience even greater difficulty proving their damages claims since indirect purchasers may have not retained proof of purchase. See In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. at 476 ("Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). These risks suggest that the settlements are fair.

With regard to the risk of maintaining the class action through trial, the Certified Classes are proceeding to trial against the non-settling defendants. This fact suggests that the Certified Classes would have been able to maintain their class action against Aland through trial if not for the settlement. At least one court has considered the fact that, "[a]bsent settlement, the action likely would have been tried" as "a factor weighing against settlement." Park, 2008 WL 4684232, at *4. On the other hand, whether the indirect purchasers would be certified as a class absent a settlement and eventually proceed to trial is not certain. Therefore, for the indirect purchasers, this factor weighs in favor of settlement.

5.    *Aland's Ability to Withstand a Greater Judgment*

There is no evidence on the record that Aland could not withstand a greater judgment than those provided for by the settlement agreements. According to some courts this factor weighs against finding that a settlement is fair. Id. Other courts have observed, though, that "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone

9

does not undermine the reasonableness of the instant settlement." Weber v. Gov't Emps. Ins. Co., 262 F.R.D. 431, 447 (D.N.J. 2009).

> 6. *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Litigation Risks*

Plaintiffs estimate that the direct purchasers suffered damages of $54.1 million and the Direct Purchaser Damages Class settlement fund of $9.5 million represents 17.5 % of the class' total actual damages. With regard to the Indirect Purchaser Settlement fund, plaintiffs estimate that the $1 million settlement represents approximately 22% of the class' total actual damages. Other courts have concluded that a settlement equal to 17.5% of damages is within the band of reasonable settlements. See Nichols v. Smithkline Beecham Corp., No. Civ, 00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) (concluding, in an antitrust case, that a settlement of "between 9.3% and 13.9% of damages . . . is consistent with those approved in other complex class action cases.") Second Circuit courts, however, emphasize that "the dollar amount of the settlement by itself is not decisive in the fairness determination, and the fact that the settlement fund may equal only a fraction of the potential recovery at trial does not render the settlement inadequate." In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 131 (S.D.N.Y. 1997).

No class members or objectors have challenged the reasonableness of the settlement amounts or, for that matter, the provision regarding injunctive relief. Further, plaintiffs highlight the fact that the Aland settlements are the first civil settlements with a Chinese company in a U.S. antitrust cartel case. In light of these facts, plaintiffs' possible recovery, and the attendant risks of litigation, the Court concludes that the settlement agreements fall within the range of

reasonableness. And, taking into account the totality of the <u>Grinnell</u> factors, the Court finds that the settlement agreements are fair, adequate, and reasonable.[2]

C.    <u>Allocation Plan</u>

"'As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable' under the particular circumstances of the case." <u>In re Visa Check/Mastermoney Antitrust Litig.</u>, 297 F. Supp. 2d at 518 (quoting <u>In re PaineWebber Ltd. P'ships Litig.</u>, 171 F.R.D. at 133). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." <u>In re Am. Bank Note Holographics, Inc.</u>, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001).

With regard to the Direct Purchaser Damages Class, the Court finds that the allocation plan is reasonable. Once attorneys' fees and expenses are deducted from the $9.5 million settlement fund, the remainder of the fund will be distributed among class members who submit valid claims in a proportionate manner. The Direct Purchaser Damages Class is largely composed of sophisticated businesses and no class members have objected to this method of distribution.

On the other hand, three members of the Indirect Purchaser Damages Settlement Class have objected to the proposed *cy pres* allocation of the settlement fund. *Cy pres* distributions are appropriate "where class members are difficult to identify" or in "circumstances in which direct distribution to individual class members is not economically feasible" or "where the proof of individual claims would be burdensome or distribution of damages costly." <u>See Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir. 2007) (internal quotation marks omitted). The Indirect Purchaser Damages Settlement Class consists of every person in 21 states

---

[2] The Court also notes that Aland has complied with its obligation under the Class Action Fairness Act, 28 U.S.C. § 1715(b), to serve "appropriate" state and federal officials with notice of the proposed settlement.

11

that indirectly purchased a vitamin C product for use or consumption at some point over a five year period. It is unclear how these purchasers could be identified in any principled or consistent way since the vast majority of them likely did not retain receipts or other proof of their purchases. Counsel estimates there are millions of such purchasers, and given the nature of the products at issue and their distribution, the Court has no reason to doubt this estimate. In light of these factors, the Court agrees with counsel that a direct cash distribution to class members is not feasible or practical and the Court rejects the objections to the extent they claim that a direct cash distribution to members of the Indirect Purchaser Damages Settlement Class is or may be practical.

The Court is mindful of its duty to choose an appropriate *cy pres* recipient so that the settlement funds are put to their "*next best* compensation use, e.g., for the aggregate, indirect, prospective, prospective benefit of the class." Masters, 473 F.3d at 436. The Court agrees with counsel for the Indirect Purchaser Damages Settlement Class that the Court will be best able to make this decision once the total amount of money going to indirect purchasers of vitamin C is known and that holding the $1 million settlement fund in an interest-bearing escrow account until that time is reasonable.

The Court also rejects the objectors other challenges to the planned *cy pres* allocation of the settlement fund for the Indirect Purchaser Damages Settlement Class. First, one objector argues that a settlement where class members get nothing in exchange for a release of their claims amounts to an unconstitutional taking. In essence, the objector is claiming that the settlement is depriving her of her property right in her claim without due process of law. "Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages." Hecht v. United Collection

Bureau, Inc., 691 F.3d 218, 222 (2d Cir. 2012). Although the claims of the Indirect Purchaser Damages Settlement Class involve money damages, the objector, like all class members, has been afforded an opportunity to opt out of the settlement class, satisfying the requirements of due process.

The objector also challenges the certification of the Indirect Purchaser Damages Settlement Class by arguing that the *cy pres* arrangement makes counsel's interests antagonistic to those of the class members and that the class should be divided into smaller, state-by-state classes. The Court rejects the argument that the Indirect Purchaser Damages Settlement Class should be subdivided into smaller classes. The Court has already ruled that the Indirect Purchaser Damages Settlement Class meets the requirements of Rule 23(a) and Rule 23(b) and the objector's argument does not suggest otherwise. If anything, smaller classes will result in less efficiency and a lower likelihood of recovery for class members. Second, the objector's challenge to the *cy pres* distribution only goes to the reasonableness of the allocation plan, not the underlying fitness of the settlement class. The Court is not convinced that the *cy pres* distribution here creates any greater antagonism between class members and class counsel than the standard arrangement whereby counsel takes its fees from the common fund for class members.

     D.    Class Notice

Under Rule 23(e)(1), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [settlement] proposal." The Second Circuit has held that "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." Wal-Mart, 396 F.3d at 113. There are "no rigid rules to determine whether a settlement notice satisfies constitutional or

Rules 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." Id. (internal quotation marks omitted). Factors that courts consider in determining whether notice to absent class members is adequate include: (1) whether there has been a succinct description of the substance of the action and the parties' positions, (2) whether the parties, class counsel, and class representatives have been identified, (3) whether the relief sought has been indicated, (4) whether the risks of being a class member, including the risk of being bound by the judgment have been explained, (5) whether the procedures and deadlines for opting out have been clearly explained, and (6) whether class members have been informed of their right to appear in the action through counsel. See In re Payment Interchange Fee & Merch. Discount Antitrust Litig., No. 05-MD-1720, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008). Here, the contents of the class notice provide sufficient information about the lawsuit, the parties, the risks and rights of class members, and the procedures by which a class member can exclude himself from a class or object to the settlements. The notice was also distributed widely, through the internet, print publications, and targeted mailings. The Court concludes that the distribution of the class notice was adequate.

An objector to the settlement for the Indirect Purchaser Damages Settlement Class has, however, challenged the adequacy of the notice on the ground that the notice does not name an organization that will be the *cy pres* recipient of the $1 million settlement fund. While some courts have faulted settlements that fail to identify the *cy pres* recipient, see Dennis v. Kellogg Co., ___ F.3d___, 2012 WL 3800230 (9th Cir. Sept. 4, 2012), here the Court believes that the plan proposed by counsel for the Indirect Purchaser Damages Settlement Class is a reasonable one. Specifically, counsel will retain the $1 million settlement fund in an interest-bearing escrow

14

account until the time at which the full amount of indirect purchaser damages is known, either because the other defendants have settled or the jury has awarded damages against them. Knowing the amount of total damages will help counsel and the Court in identifying a *cy pres* recipient or selecting some other means of distribution that is most appropriate and efficient. Further, since notice will have to be sent to indirect purchasers in any event once there are additional settlement funds or damages, plaintiffs' proposal will likely not result in an unnecessary expenditure in order to re-notice the indirect purchasers.

It is, of course, possible that the other defendants do not settle and then prevail at trial, in which case the only funds available to the indirect purchasers will be the $1 million settlement amount from Aland. In this scenario, having to re-notice the Indirect Purchaser Damages Settlement Class in order to identify the *cy pres* recipient would, unfortunately, result in a further depletion of the settlement fund. Since, however, the Court is convinced that only a *cy pres* distribution of the settlement fund is feasible, the Court is not troubled by this possibility.

## II.    The Requests for Attorneys' Fees and Expenses and Incentive Awards

### A.    Counsel and Representatives for the Certified Classes

Counsel for the Certified Classes requests an award of $3.7 million to be drawn from the Direct Purchaser Damages Class settlement fund. Of this sum, $2.5 million would cover the out-of-pocket expenses that counsel has amassed since 2005. Counsel requests the remaining $1.2 million as attorneys' fees. The total award is approximately 39% of the total Certified Classes settlement fund, while the $1.2 million attorneys' fees award is approximately 12.6% of the fund and is a fraction of the approximately $7.3 million lodestar that Class Counsel claims based on over 20,000 hours worked. Class Counsel also requests an incentive award of $50,000 for each of the two representatives of the Certified Classes. In accordance with the settlement agreement,

15

the awards for counsel and representative plaintiffs would be paid proportionately as Aland funds the settlement fund escrow account.

### 1. *Fees*

Rule 23(h) allows the Court to award reasonable attorneys' fees to counsel for a certified class. "Where a class action settlement creates a common fund the plaintiffs' attorneys 'are entitled to a reasonable fee – set by the court – to be taken from the fund.'" In re Ashanti Goldfields Sec. Litig., No. 00-CV-717, 2005 WL 3050284, at *2 (E.D.N.Y. Nov. 15, 2005) (quoting Goldberger v. Integrated Res. Inc., 209 F.3d 43 (2d Cir. 2000)). Fees can be awarded based on an interim settlement. See In re Sterling Foster & Co., Inc., Sec. Litig., 238 F. Supp. 2d 480 (E.D.N.Y. 2002). In awarding a fee, the court must act "with moderation and a jealous regard to the rights of those who are interested in the fund." Grinnell, 495 F.2d at 469. The Second Circuit allows courts to use either the lodestar method or a method based on the percentage of the settlement fund when calculating appropriate attorneys' fees, Goldberger, 209 F.3d at 50, but the trend in the Second Circuit is to utilize the percentage method. In re Air Cargo Shipping Servs. Antitrust Litig., 06-md-1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011). See also Wal-Mart, 396 F.3d at 121. The lodestar method can then be used as a "cross-check." In re Air Cargo Shipping Servs. Antitrust Litig., 2011 WL 2909162, at *5. The criteria used to determine whether a common fund fee is reasonable include:

(1) the time and labor expended by counsel;

(2) the magnitude and complexities of the litigation;

(3) the risk of the litigation;

(4) the quality of the representation;

(5) the requested fee in relation to the settlement; and

(6) public policy considerations.

In re Air Cargo Shipping Servs. Antitrust Litig., 2011 WL 2909162, at *6 (quoting Goldberger, 209 F.3d at 50).

Most of the Goldberger factors do not require much discussion. The first, second, third, fourth, and sixth factors all support a finding that award of fees to counsel for the Certified Classes is reasonable. This action, like most antitrust actions, is complex. Park, 2008 WL 4684232. Counsel spent over 20,000 hours prosecuting this case over seven years, including engaging in complex discovery and motion practice. See id. at *6 (finding class counsel's time and labor to be "significant" in an antitrust case in light of lengthy and voluminous discovery, motion practice, and settlement negotiations). Additionally, counsel faced substantial risks in litigating this action, especially on a contingency fee basis. These risks include the availability of unique defenses concerning Chinese law, the possibility of being unable to enforce a judgment, and the high costs involved in litigating where the record is in Chinese and where they is no earlier governmental action or investigation on which to piggy-back. See Goldberger, 209 F.3d at 53-54 (discussing similar factors when evaluating risk). Further, for the reasons discussed, Class Counsel is abundantly qualified and has been victorious on a number of motions before the Court. Finally, with regard to public policy, "[f]ee awards should provide lawyers with sufficient incentive to bring common fund cases that serve the public interest, but they should not provide counsel with an unwarranted windfall." In re Air Cargo Shipping Servs. Antitrust Litig., 2011 WL 2909162, at *6 (internal quotation marks and citations omitted). Consequently, a reasonable fee award is justified.

The fifth Goldberger factor is of the greatest use in assessing the reasonableness of the proposed fee award because it requires examination of the amount of the award in the context of

the size of the settlement fund. At this juncture, counsel only seeks a fee equal to 12% of the fund and a fraction of its lodestar. This fee amount is reasonable under either the percentage method or the lodestar method. See In re Lloyd's Am. Trust Fund Litig., No 96 Civ. 1262, 2002 WL 31663577, at *26-27 (S.D.N.Y. Nov. 26, 2001) (noting that "[i]n this district alone, there are scores of common fund cases where fees alone . . . were awarded in the range of 33-1/3% of the settlement fund" and observing that lodestar multiples of between 3 and 4.5 had "become common"). Further, the notice sent to class members provides that "Class Counsel will ask the Court for up to 33% of the Direct Purchaser Damages Class Settlement Fund . . . for attorneys' fees, plus expenses." Counsel has sought a fee award of far less than 33% of the fund and no class member has objected to counsel's request for fees. Therefore, the Court finds that this fee request is reasonable.

     2.   *Expenses*

Generally, "[c]ounsel is entitled to reimbursement from the common fund for reasonable litigation expenses." In re Ashanti Goldfields Sec. Litig., 2005 WL 3050284, at *5. "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." In re Arakis Energy Corp. Sec. Litig., No. 95 CV 3421, 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001). Costs may be awarded even though the action is proceeding against other defendants. See In re Towers Fin. Corp. Noteholders Litig., No. 93 Civ. 810, 1996 WL 393213, at *2 (S.D.N.Y. Feb. 28, 1996) ("Regardless of what happens in the balance of the litigation, counsel's efforts have benefitted the class, and there is no reason that part of counsel's expenses should not be reimbursed now.")

Counsel for the Certified Classes does not devote much attention to this portion of its requested award, despite its size. Regardless, the Court concludes that counsel's request for

18

reimbursement of its litigation expenses is reasonable. The principal expenses for which Class Counsel seeks reimbursement are expert witness costs, deposition reporters and transcripts, translation and review of Chinese-language documents, copying, travel, research, and court-filings – all of which are appropriate for reimbursement.

### 3.    *Incentive Awards for Representative Plaintiffs*

Courts often grant incentive awards to representative plaintiffs. "The amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, 2012 WL 3878825, at *2 (S.D.N.Y. Aug. 22, 2012). In granting an incentive award, "a court must ensure that the named plaintiffs, as fiduciaries for the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members. A particularly suspect arrangement exists where the incentive payments are greatly disproportionate to the recovery set aside for absent class members." Sheppard v. Consol. Edison Co. of New York, Inc., No. 94-CV-0403, 2002 WL 2003206, at *6 (E.D.N.Y. Aug. 1, 2001).

Here, Ranis and Animal Science each seek $50,000, as disclosed in the class notice. They point to their work responding to discovery requests, including collectively producing over 10,000 pages of documents, sitting for depositions, and agreeing to appear at trial. At the fairness hearing counsel for the Certified Classes argued that, given the length and complexity of this litigation, no entity would have agreed to be a representative plaintiff for less than $50,000. Additionally, counsel estimates that members of the Direct Purchaser Damages Class may receive payments of up to $940,000 from the settlement fund. In light of the size of the possible payments to class members, the length and complexity of this litigation, and the substantial

19

efforts expended by Ranis and Animal Science on behalf of the class, the Court finds that the

proposed incentive awards are appropriate. See Wright v. Stern, 553 F. Supp. 2d 337 (S.D.N.Y.

2008) (approving awards of $50,000 to each of 11 named plaintiffs in an employment

discrimination case that spanned a decade). Further, no member of the Certified Classes has

objected to the incentive awards, although one purported member of the Indirect Purchaser

Damages Settlement Class did complain about settlement money being diverted to named

plaintiffs. Even if the objector had standing to make this objection, the objection does not

explain what, if anything, is improper about the incentive award.

B.     Indirect Purchasers' Counsel

At this juncture, counsel for the indirect purchasers only seeks reimbursement for

expenses, in the amount of $121,271.86. The class notice advised that plaintiffs' counsel would

request up to 33% of the settlement fund for attorneys' fees and expenses and counsel's expenses

represent approximately 12% of the Indirect Purchaser Damages Settlement Class fund.

The expenses for which the indirect purchasers' counsel seeks reimbursement include

assessments; copying; service of process; court costs, including court reporting and filing fees;

travel; research costs; and expert costs. In support of its request for costs, indirect purchasers'

counsel argues that, together with counsel for the Certified Classes, it engaged in extensive

discovery until November 2008, when the indirect purchaser actions were stayed pending final

judgment on the Certified Classes' claims. Further, indirect purchasers' counsel began

negotiating a settlement with Aland in March 2012.

For the reasons discussed in the context of Certified Classes' counsel's request for

expenses, indirect purchasers' counsel's expenses are also appropriate for reimbursement. Since

all of the objectors are indirect purchasers, they implicitly challenge counsel's request for

20

reimbursement of expenses when they call attention to the fact that the settlement diverts money to attorneys. Although class members may prefer it if settlement funds were not diverted to attorneys, plaintiffs have satisfied their burden of showing that the expenses for which they seek reimbursement were reasonable and the class members' objection does not demonstrate otherwise.

## CONCLUSION

Plaintiffs' motion for final approval of the Aland settlements [507] is granted. The Court also grants plaintiffs' motions for fees and expenses [510 and 511].

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated: Brooklyn, New York
       October 22, 2012