UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                    :
IN RE VITAMIN C ANTITRUST LITIGATION                :
                                                    :       06-MD-1738 (BMC) (JO)
------------------------------------------------------------- :
                                                    :
This document relates to:                           :
                                                    :
ANIMAL SCIENCE PRODUCTS, INC., et al.,              :       **MEMORANDUM
                                                    :       DECISION AND ORDER**
                    Plaintiffs,                     :
                                                    :       05-CV-0453
v.                                                  :
                                                    :
HEBEI WELCOME PHARMACEUTICAL CO.                    :
LTD., et al.,                                       :
                                                    :
                    Defendants.                     :
                                                    :
-------------------------------------------------------------- X

**COGAN,** District Judge.

This litigation arises out of allegations that defendants, several Chinese vitamin C manufacturers, conspired to "suppress competition by fixing the price and controlling export sale volumes of vitamin C offered for sale to customers in the United States and elsewhere." Defendants move to dismiss, for lack of subject matter jurisdiction, the Third Amended Complaint insofar as it refers to claims by foreign purchasers of vitamin C. Defendants also move to exclude or strike evidence related to foreign purchasers, including the inclusion of foreign purchaser claims in the damages calculations performed by Professor Bernheim, plaintiffs' expert. Finally, defendants move to exclude or strike evidence referring to sales made by two non-defendants that are alleged to be co-conspirators. For the reasons set forth below, defendants' motions are denied.

# BACKGROUND

The Court previously certified a class of Direct Purchaser plaintiffs who "directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2011 to June 30, 2006" (the "Direct Purchaser Damages Class"). Defendants argue that "taken literally, this class definition would sweep in claims by foreign purchasers involving solely foreign sales by foreign defendants." Specifically, in a number of cases, defendants sold vitamin C for delivery in the United States directly to businesses located in Japan, China, Canada, or Europe, and those businesses, in turn, resold the vitamin C to U.S. customers.

Defendants assert that sales to these foreign purchasers are outside the scope of the antitrust laws and any U.S. entities that acquired vitamin C through an intermediary foreign purchaser are, in fact, indirect purchasers and are thus excluded from the Direct Purchaser Damages Class.[1] Defendants take issue with the damages calculations performed by plaintiffs' expert, Professor Bernheim, because he relied on U.S. customs data regarding vitamin C deliveries through U.S. ports, even though some of these deliveries were the result of foreign resales of vitamin C to U.S. customers rather than direct sales by defendants to U.S. customers.

Plaintiffs paint a very different picture of the foreign purchasers. They argue that what defendants "call 'foreign purchasers' are either multinational corporations with a substantial presence in the United States or overseas brokers purchasing vitamin C delivered in the United States" and what defendants "call 'foreign sales by foreign defendants' are actually shipments of

---

[1] Defendants also highlight the fact that the Ranis Co., Inc. ("Ranis"), the class representative for the Direct Purchaser Damages Class, is, in part, an indirect vitamin C purchaser. Ranis is the assignee of the claims of the Graymoor Chemical Co., Inc. ("Graymoor"). Graymoor made direct vitamin C purchases from defendants but also made a number of purchases of vitamin C manufactured by defendants through two Canadian intermediary companies.

2

vitamin C by Defendants directly from China to ports in the United States, without stops in any other country." The purchases were not foreign purchases that were then resold to U.S. buyers, according to plaintiffs. Rather, all of the purchases were made directly from defendants for delivery in the United States. Plaintiffs offer two examples of these kinds of purchases.

One example involves Mitsubishi International Food Ingredients, Inc. ("MIFI"), an Ohio-based subsidiary of the Japanese multinational Mitsubishi Corporation. In 2005 MIFI contracted to purchase $63,000 worth of vitamin C from one defendant, Weisheng, which agreed to ship the vitamin C directly from China to Pennsylvania. Two months later, MIFI purchased $61,200 of vitamin C, again to be shipped directly from China to Pennsylvania, but the contract for this transaction was executed by a Mitsubishi executive in Japan.

The second example involves instances where a U.S. company worked with a foreign broker to purchase vitamin C for delivery in the U.S. Although Ranis purchased vitamin C directly from defendants, it also used the services of a Canadian broker, Pacific Resource Trading. Other contracts offered by defendants show that He-Ro Chemicals Ltd., a Hong Kong-based broker, purchased vitamin C from defendant Hebei to be shipped directly from China to California. Lastly, a British Virgin Islands company, Sannex Products Ltd., purchased vitamin C from Aland, a former defendant (it has settled), to be shipped directly to Charles Bowman & Co. in Michigan. Indeed all of the exhibits that defendants provide show U.S. locations as the destinations for the vitamin C to be delivered.

## DISCUSSION

The core of defendants' argument is that the foreign purchaser claims fall outside of the Court's subject matter jurisdiction and are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"). The FTAIA "excludes from the Sherman Act's reach much

3

anticompetitive conduct that causes only foreign injury." F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 158, 124 S. Ct. 2359, 2363 (2004).

## I.    The FTAIA and Jurisdiction

There is currently an unsettled legal question concerning whether the FTAIA "affects the subject-matter jurisdiction of the district court or if, on the other hand, it relates to the scope of coverage of the antitrust laws." Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 851 (7th Cir. 2012). A line of recent Supreme Court cases has emphasized that questions about a statute's reach are merits issues, not issues of subject matter jurisdiction. See Morrison v. Nat'l Australia Bank Ltd., __ U.S. __, 130 S. Ct. 2869, 2877 (2010) ("But to ask what conduct § 10(b) [of the Securities Exchange Act] reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case.") (internal quotation marks omitted). See also Arbaugh v. Y & H Corp., 546 U.S. 500, 516, 126 S. Ct. 1235, 1245 (2006) ("when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). In light of this line of cases, the Seventh Circuit has held that "the FTAIA sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts." Minn-Chem, 683 F.3d at 852. The Third Circuit has also concluded that "the FTAIA constitutes a substantive merits limitation rather than a jurisdictional limitation." Animal Sci. Prods., Inc. v. China Minmetals Corp., 654 F.3d 462, 467-68 (3d Cir. 2011).

Since Morrison, however, the Second Circuit has not opined on whether the FTAIA is jurisdictional. Under pre-Morrison Second Circuit law, the FTAIA was considered to be a limitation on the subject matter jurisdiction of the federal courts. See Sniado v. Bank Austria AG, 378 F.3d 210, 212 (2d Cir. 2004) ("affirm[ing] the district court's dismissal of [the]

4

complaint for lack of subject matter jurisdiction under § 6a(2) of the FTAIA"); Filetech S.A. v. France Telecom S.A., 157 F.3d 922 (2d Cir. 1998). Even post-Morrison, courts in the Second Circuit have continued to discuss the FTAIA in subject matter jurisdiction terms. See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd., No. 08-cv-42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) (report and recommendation), adopted at, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

The question of whether the FTAIA is jurisdictional would matter if defendants had waived their ability to bring this motion, as plaintiffs imply. Plaintiffs argue that defendants should not have waited until only weeks before trial was originally set to begin before bringing this motion since, it appears, that defendants had Professor Bernheim's report for almost four years before making the motion. In response, defendants argue that since the FTAIA goes to the Court's subject matter jurisdiction, they can bring this motion at any time under Rule 12(h)(3) of the Federal Rules of Civil Procedure.[2] The Court is sympathetic to plaintiffs' position. However, the scheduling orders in place in this action allowed the parties to bring dispositive motions concerning damages, among other things, at the time when defendants brought this motion. Since the instant motion arises out of Professor Bernheim's use of a methodology that included foreign purchaser claims in his damages calculation – an issue that was developed recently during expert discovery – and defendants' motion challenges plaintiffs' entitlement to recover that portion of their alleged damages, the Court concludes that the instant motion is timely under its scheduling orders. Thus, defendants' motion is timely whether it is characterized as a motion to dismiss for lack of subject matter jurisdiction or a motion on the merits of plaintiffs' damages claims.

---

[2] Defendants also argue the issue underlying this motion was not apparent until expert discovery, which only concluded recently.

5

Likewise, the Court does not need to decide whether the FTAIA is jurisdictional in order to determine what standard to apply to defendants' motion. Although the analysis involved in deciding a motion to dismiss for lack of subject matter jurisdiction is different from the analysis involved in deciding a motion for summary judgment on an element of a claim, that distinction is irrelevant for this motion because there are no material facts in dispute. Both parties agree that the vitamin C at issue was bought overseas by foreign purchasers and shipped into the United States. The parties only offer competing interpretations of these facts. The only task for the Court, therefore, is to determine whether, on these facts, the FTAIA bars the foreign purchaser claims or not. If the Court concludes, as it does, that plaintiffs have demonstrated that the FTAIA does not bar their foreign purchaser claims, then defendants' motion must be denied regardless of whether it is construed as jurisdictional or as a motion for summary judgment.

## II.     Application of the FTAIA

The FTAIA removes "from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad" subject to certain exceptions. Empagran, 542 U.S. at 161, 124 S. Ct. at 2364. Specifically, the statute provides that "Sections 1 to 7 of [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –

> (1) such conduct has a direct, substantial, and reasonably foreseeable effect-
>
>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>
>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of [the Sherman Act], other than this section."

6

15 U.S.C. § 6a. In other words, there are "[t]wo types of Sherman Act claims that implicate import trade or import commerce [which] fall outside the scope of the FTAIA." In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-md-1775, 2008 WL 5958061, at *14 (E.D.N.Y. Sept. 26, 2008) (report and recommendation), aff'd in relevant part, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009). The first is the "'import trade or commerce' parenthetical, [which] provides that the antitrust law *shall* apply to conduct 'involving' import trade or commerce with foreign nations." Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000), overruled on other grounds, Animal Sci. Prods., 654 F.3d at 467-68. I shall refer to this exception as "the import exception."[3] The second is that "the FTAIA brings back within the reach of the Sherman Act conduct involving nonimport trade or nonimport commerce when that conduct (1) has a direct, substantial, and foreseeable effect *on* import trade or import commerce, and (2) the Sherman Act claim arises out of that effect." In re Air Cargo Shipping Servs. Antitrust Litig., 2008 WL 5958061, at *14 (emphasis in original). I shall refer to this exception as the "domestic effects exception."

A.      The Import Exception

Plaintiffs argue that the FTAIA is not applicable to the foreign purchaser claims because defendants' conduct falls within the import exception. They argue that although some of the vitamin C may have been paid for through transactions with foreign entities that occurred abroad, "[t]he very contracts attached to Defendants' motion illustrate that in exchange for payments from class members to Defendants, the Defendants put vitamin C on a ship and sent it directly to a U.S. port." Defendants, on the other hand, emphasize the importance of the location

---

[3] The Seventh Circuit has observed that the import trade or commerce exception is not, strictly speaking, an 'exception' from the FTAIA. See Minn-Chem, 683 F.3d at 854. This Court adopts the term only for ease of reference.

of the transaction, the buyer, and the seller, and argue that because the foreign purchaser claims involved transactions between foreign buyers and foreign sellers that took place abroad, the import exception does not apply.

Defendants' interpretation of the import exception is too narrow. Although the FTAIA "does not define the term 'import,' . . . the term in general denotes a product (or perhaps a service) has been brought into the United States from abroad." Turicentro S.A. v. Am. Airlines, 303 F.3d 293, 303 (3d Cir. 2002), overruled on other grounds, Animal Sci. Prods., 654 F.3d at 467-68. Additionally, the FTAIA "makes clear that not only import commerce, but conduct *involving* import commerce, is never removed from the reach of the Sherman Act." In re Air Cargo Shipping Servs. Antitrust Litig., 2008 WL 5958061, at *12. Although the import commerce exception "must be given a relatively strict construction[,]" Carpet Grp., 227 F.3d at 72, it does not require "that the defendants function as the physical importers of goods." Animal Sci. Prods., 654 F.3d at 470. "Rather, the relevant inquiry is whether the defendants' alleged anticompetitive behavior 'was directed at an import market.'" Id. (quoting Kruman v. Christie's Int'l PLC, 284 F.3d 384 (2d Cir. 2002), abrogated on other grounds by Empagran, 542 U.S. at 161, 124 S. Ct. at 2364).

Here, plaintiffs have demonstrated that defendants' conduct was directed at the U.S. import market. The Third Amended Complaint alleges that "defendants and their co-conspirators have participated in meetings and conversations in China and elsewhere in which the price, volume of sales and exports to the United States, and markets for vitamins were discussed and agreed upon." The sale contracts provided by the parties show that defendants specifically contracted for the delivery of vitamin C to locations within the U.S. Even though many of the transactions at issue took place abroad among foreign parties, the intent and result of

those transactions was the direct importation of vitamin C into the U.S. See Minn-Chem, 683 F.3d at 854 ("The applicability of U.S. law to transactions in which a good or service is being sent directly into the United States, with no intermediate stops, is both fully predictable to foreign entities and necessary for the protection of U.S. consumers.").

A comparison of defendants' conduct to the facts in other cases addressing the import exception demonstrates that the exception applies. In Carpet Group, the court found that the exception applied where plaintiffs alleged that defendants took steps to "(1) prevent foreign manufacturers from selling to United States retailers, (2) prevent at least one American retailer from purchasing rugs directly from foreign manufacturers, (3) prevent foreign governments and trade associations from sponsoring trade fairs at which retailers could purchase directly from foreign manufacturers, and (4) prevent an American rug retailers' association from sponsoring the trade fairs." 227 F.3d at 72. The exception was also found to apply in In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827, 2012 WL 3763616 (N.D. Cal. Aug. 29, 2012), where foreign defendants shipped and invoiced the products to the United States, before they were shipped to Mexico for finishing, and ultimately returned to the United States to be sold to consumers.

On the other hand, the exception has been found not to apply where goods or services were not delivered directly into the United States. In Turicentro, defendant air carriers conspired to fix commission rates paid to plaintiffs, travel agents based outside the United States. Even though some U.S. customers purchased plaintiffs' services, the Third Circuit held that because "[d]efendants did not directly bring items or services into the United States" and defendants "did not directly increase or reduce imports into the United States," defendants were not "engaged in 'import trade or commerce.'" 303 F.3d at 303. Likewise in Kruman, the Second Circuit found

9

that the exception did not apply where "the defendants' conspiracy appears to have been directed at controlling the prices they charged for their services in foreign auctions." 284 F.3d at 395. The Second Circuit specifically noted that "the commerce that is the focus of this case is the charging of fixed commissions on the purchase and sales of goods at foreign auctions, not the trade and subsequent movement of the goods that were purchased and sold." Id.

Here, by contrast, the focus of the litigation is on "the trade and subsequent movement of the goods that were purchased and sold." Although defendants sometimes contracted with foreign entities, they knew, by the terms of those very contracts, that the vitamin C was to be delivered directly to the United States. See Animal Sci. Prods., 654 F.3d at 471 n.11 ("[W]e consider the delivery location of goods sold by a foreign seller to be relevant to whether that seller's actions were directed at a United States import market, rather than some foreign market"). Consequently, the effects of defendants' price-fixing were felt by American consumers, even when the transaction was entered into overseas. Just as in In re TFT-LCD (Flat Panel) Antitrust Litig., the intervening foreign conduct here does not prevent a conclusion that defendants' conduct was directed at the U.S. import market. Thus, the Court finds that the foreign purchaser claims fall within the import trade or commerce exception and that the FTAIA is inapplicable.

B.    The Domestic Effects Exception

Alternatively, plaintiffs argue that even if the FTAIA applies, the foreign purchaser claims would remain within the reach of the Sherman Act because of their "direct, substantial, and foreseeable effect" on domestic commerce in vitamin C and because this effect gives rise to a Sherman Act claim. 15 U.S.C. § 6a(1)-(2). Defendants maintain that plaintiffs cannot avail themselves of this domestic effects exception because plaintiffs have failed to show that the

10

domestic effects of their conduct proximately caused plaintiffs' foreign injuries. The Court agrees with defendants that "under FTAIA the domestic effects must occur first and then proximately cause the foreign antitrust claim." In re Hydrogen Peroxide Antitrust Litig., 702 F. Supp. 2d 548, 551 (E.D. Pa. 2010). Although it is a close issue, the Court concludes that the domestic effects exception applies.

In determining whether there is a "direct, substantial, and foreseeable effect" on domestic commerce under § 6a(1), "[t]he geographic target of the alleged anticompetitive conduct matters greatly." Turicentro, 303 F.3d at 305. Further, courts have concluded that allegations "consisting of Defendants' participation in an overarching worldwide conspiracy to raise, stabilize, and maintain [] prices, and Defendants' establishment of price-fixing agreements . . . both inside and outside of the United States . . . adequately pleads that Defendants' conduct had the necessary effect on domestic commerce within the meaning of § 6a(1)." Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V., No. 03 Civ. 10312, 2005 WL 2207017, at *6 (S.D.N.Y. Sept. 8, 2005) (internal quotation marks omitted).

Here, plaintiffs alleged not only that defendants conspired to fix the prices they charged for vitamin C on the global market, but also that they "deliberately targeted and severely burdened consumers in the United States." Consistent with their pleading, plaintiffs have demonstrated, through the sales contracts, that defendants shipped their vitamin C products directly to the United States. Indeed, the definition of the Direct Purchaser Damages Class only encompasses those who purchased defendants' vitamin C for delivery in the United States. Super-competitive prices for vitamin C in the United States were the "direct, substantial, and foreseeable effect" of defendants' conduct, and defendants do not argue otherwise. Therefore, the first prong of the domestic effects exception is satisfied.

11

Defendants' arguments primarily focus on the second prong of the domestic effects exception, § 6a(2), which concerns whether the domestic effect of defendants' conduct "gives rise" to an antitrust claim. In Empagran, the Supreme Court established that § 6a(2) is not satisfied where a plaintiff's claim "rests solely on the independent foreign harm." 542 U.S. at 159, 124 S. Ct. at 2363. The Supreme Court did not, however, rule on plaintiffs' argument that the domestic effects exception applied because "the anticompetitive conduct's domestic effects were linked to [the] foreign harm[,]" 542 U.S. at 175, 124 S. Ct. at 2372, and instead remanded the case for consideration of that issue. On remand, plaintiffs argued that "[b]ecause the [defendants'] product (vitamins) was fungible and globally marketed, they were able to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States as well." Empagran S.A. v. F. Hoffman-La Roche Ltd., 417 F.3d 1267, 1270 (D.C. Cir. 2005). The Court of Appeals rejected this arbitrage theory of causation, reasoning that,

> [w]hile maintaining super-competitive prices in the United States may have facilitated the [defendants'] scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation. It does not establish . . . that the U.S. effects of the [defendants'] conduct – i.e., increased prices in the United States – proximately caused the foreign [plaintiffs'] injuries.

Id. at 1271.

Other courts have followed the D.C. Circuit's Empagran decision and concluded that the proximate cause requirement is not satisfied where plaintiffs' theory is that the domestic effects of a global conspiracy caused their foreign injuries because of an indivisible global market for the relevant good. See, e.g., In re Graphite Electrodes Antitrust Litig., Nos. 10-md-1244, 00-5414, 2007 WL 137684 (E.D. Pa. Jan. 16, 2007) (collecting cases). As one court explained in the context of the global wheat market,

> [a]lthough the complaint's description of 'the global nature of the wheat pricing mechanism' may paint a plausible scenario by which [defendants'] conduct in

> Iraq might well have been a factual, or 'but for,' cause of a drop in domestic wheat prices, such 'but for' causation is not the type of *direct* causation contemplated by the FTAIA. Accepting as true plaintiffs' allegations that [defendants'] conduct foreclosed the Iraqi wheat market to U.S.-grown wheat, that this foreclose affected the projected Ending Stocks for U.S.-grown wheat, and that the 'main determinant' of domestic wheat prices is the level of projected Ending Stocks, the fact remains that a myriad of other factors – including foreign and domestic market conditions, crop yields, harvesting and transportation costs, and other factors affecting global supply and demand – also impacted projected Ending Stocks, and hence domestic wheat prices during the proposed class period.

Boyd v. AWB Ltd., 544 F. Supp. 2d 236, 244-45 (S.D.N.Y. 2008) (internal citations omitted).

This case could not be more different from Boyd. Defendants' agreement to restrain production and fix vitamin C prices increased prices of vitamin C to be delivered to the United States. Since the foreign purchasers were buying vitamin C *for delivery to the United States*, the super-competitive prices that they paid were the direct result of the increased prices caused by defendants' conduct. Defendants have not identified, nor is the Court aware of, any intervening factors that may have influenced the price the foreign purchasers paid other than defendants' anticompetitive conduct. Moreover, plaintiffs do not rely on the arbitrage theory of causation that was at issue in Empagran. Their argument is not that the foreign purchasers were overcharged because they paid a super-competitive global price which was maintained, in part, by a super-competitive price in the United States. Instead, plaintiffs' (albeit imperfectly articulated) theory is that because the foreign purchasers were buying vitamin C for delivery in the United States, the super-competitive prices they paid were the immediate result of defendants' conspiracy to fix prices for vitamin C delivered to the United States.

The cases on which defendants rely are inapposite because the goods at issue in those cases never reached the United States and were not being purchased for delivery to the United States. See Empagran, 542 U.S. at 159, 124 S. Ct. at 2364 (addressing a motion to dismiss the claims of "five foreign vitamin distributors located in Ukraine, Australia, Ecuador, and Panama,

each of which bought vitamins from [defendants] for delivery outside the United States"); In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 989 (9th Cir. 2008) (ruling that, where plaintiff was "a foreign consumer that made its purchases entirely outside of the United States," its allegations that "super-competitive DRAM prices in the United States may have facilitated the defendants' scheme to charge super-competitive prices abroad" did not satisfy the domestic effects exception); In re Monosodium Glutamate Antitrust Litig., 477 F.3d 535, 537 (8th Cir. 2007) (affirming dismissal of claims of foreign corporations where they "do not assert that they purchased or attempted to purchase [chemicals] in the United States market."); In re Hydrogen Peroxide Antitrust Litig., 702 F. Supp. 2d 548 (dismissing claims for chemicals delivered in Europe); Latino Quimica-Amtex, 2005 WL 2207017 (dismissing claims for chemicals purchased by Mexican, Argentinian, and Colombian companies in foreign markets).[4]  Because here, the foreign purchasers were overcharged immediately because of their purchases of vitamin C for delivery to United States, I find that the domestic effects exception to the FTAIA applies.

Still, defendants maintain that it is the location of the purchase or transaction, rather than the location of delivery that, is relevant for both the FTAIA analysis and the largely related question of whether the foreign purchasers have standing under the antitrust laws, which is discussed further below.  Defendants cite two cases that, they contend, emphasize that the location of the transaction is the dispositive factor.  See In re TFT-LCD (Flat Panel) Antitrust

---

[4] Plaintiffs also rely on another decision in In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827, 2010 WL 2610641 (N.D. Cal. June 28, 2010), in which the court dismissed Motorola's foreign purchaser claims under § 6a(2). The dispute there centered on "whether Motorola can seek to recover based on foreign-sold panels that were subsequently incorporated into Motorola products that Motorola and others – but not defendants – shipped to and sold in the United States." Id. at * 3.  This decision is inapposite because there was no way that the foreign injury at issue – the overcharge to Motorola's foreign affiliates – could have been proximately caused by a domestic effect of defendants' conduct when it was the actions of Motorola and others, rather than defendants' conduct, that brought the goods into U.S. commerce.  Here, by contrast, it was defendants' actions that brought vitamin C into U.S. commerce.

Litig., No. M 07-1827, 2012 WL 506327 (N.D. Cal. Feb 15, 2012); In re Static Random Access Memory (SRAM) Antitrust Litig., 2010 WL 5477313. Defendants overstate the implication of these cases. Although the Flat Panel court opined that "it is the location of the purchase, not the ultimate destination of the [] products, that determines where the injury occurred," 2012 WL 506327, at *3, the products at issue were "purchased in and sent to the United States." Id. The court only rejected the argument that plaintiff's claims were non-actionable because it took possession of the products abroad and brought them into the U.S. itself. In SRAM, the court concluded that the direct purchaser "Plaintiffs' claims based on purchases of SRAM billed to the United States, even where the SRAM was shipped elsewhere, are not precluded by the FTAIA, because [direct purchaser] plaintiffs have satisfied the requirements of the domestic effect exception." 2010 WL 5477313, at *7. Contrary to defendants' argument, these cases only show that payment for a product in the United States is sufficient to create a domestic effect for FTAIA and antitrust standing purposes. The cases do not make payment in the United States a necessary precondition for finding a domestic effect. In Empagran, the Supreme Court only held that a situation where both the purchase *and* the delivery of goods took place outside of the United States fails to satisfy the domestic effects exception. See 542 U.S. at 159-60, 124 S. Ct. at 2364. Empagran leaves open the possibility that the domestic effects exception may be satisfied where either the purchase or the delivery of goods takes place within the United States. Indeed, defendants have cited no case where delivery of the goods into the United States was found to be insufficient for FTAIA purposes and the Court is unaware of any.

## III.    Standing

For a plaintiff to have standing under the antitrust laws, he "must have suffered an injury the antitrust laws were intended to prevent, and the injury must flow from that which makes the

15

defendant's acts unlawful." Turicentro, 303 F.3d at 307. There is no dispute that a foreign entity can have standing under the U.S. antitrust laws. See Eurim-Pharm GmbH v. Pfizer, Inc., 593 F. Supp. 1102, 1106 (S.D.N.Y. 1984) ("When the activity complained of has a demonstrable effect on United States domestic or import commerce, foreign corporations injured abroad may seek recovery under the Sherman Act."). In In re Air Cargo Shipping Servs. Antitrust Litig., the court recognized that an argument that foreign purchasers do not have standing to assert their claims because they lack a cognizable antitrust injury is intertwined with FTAIA considerations and concluded that because the claims were cognizable under the FTAIA import exception, "it follows that the plaintiffs have asserted an antitrust injury." 2008 WL 5958061, at *15-16. Here, the Court has already concluded that the FTAIA does not bar the application of the antitrust laws to the foreign purchaser claims because the claims satisfy the import exception and, alternatively, the domestic effects exception. The Court adopts the approach in In re Air Cargo Shipping Servs. Antitrust Litig. and finds that the foreign purchaser claims are cognizable under the antitrust laws.

Defendants raise two principal challenges to the foreign purchasers' antitrust standing. First, defendants argue that the location of the transaction is the dispositive factor rather than the market into which the goods were delivered. For the same reasons already discussed in the context of the domestic effects exception, the Court does not accept that conduct which affects the U.S. market because the goods are delivered into the U.S. cannot constitute a cognizable antitrust injury merely because the purchase transaction took place abroad. Defendants have cited no authority to support such a rule and it is not implied by controlling precedent.

Second, defendants argue that allowing the foreign purchasers to assert claims would create a risk of double recovery because plaintiffs would also seek to "recover for the amount

16

paid by the U.S. recipient of the shipment to the foreign reseller." The definition of the Direct Purchaser Damages Class forecloses this risk. The class is limited to entities that purchased vitamin C directly from defendants. Where the foreign purchaser has a claim for the overcharge on a particular delivery of vitamin C, the U.S. recipient of that delivery would be, by definition, an indirect purchaser and outside of the defined class. Plaintiffs readily admit that "[w]hich entity qualified as the 'direct purchaser' in each of the transactions depends on how the particular purchase was structured, including with respect to the flow of payments." The Court agrees with plaintiffs that distinguishing between the direct and indirect purchaser for a particular transaction "is irrelevant to determining whether this Court has subject matter jurisdiction over claims arising from such purchases" or whether the claims are cognizable and that this issue can be addressed during the claims administration process.[5]

## IV.    Defendants' Motion to Exclude Evidence Related to the Foreign Purchaser Claims

Defendants' motion to strike "from Professor Bernheim's expert report any damages claimed with respect to sales made by defendants to foreign purchasers" and to exclude "from the evidence that Plaintiffs can present to a jury any portion of the record that refers to damages based on foreign purchases of vitamin C from defendants to foreign resellers" hinges on the exclusion of the foreign purchaser claims. Defendants' sole criticism of Professor Bernheim's

---

[5] For this reason, defendants reliance on Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc., 424 F.3d 363 (3d Cir. 2005), is unavailing. Dentsply does not address the FTAIA at all, nor the domestic effects of anticompetitive conduct where the relevant goods are delivered into the United States. All Dentsply stands for is that plaintiffs cannot avoid the bar on indirect purchaser damages under the antitrust laws "by claiming they were direct purchasers of drop shipments [shipments that were not sent through a dealer] when their complaint specifically alleges that they did not purchase directly from Dentsply." Id. at 372-73. Dentsply's comment that "the fact that some of the teeth are drop shipped directly from Dentsply to Plaintiffs does not affect the economic substance of the transaction," id. at 373, addressed the attempt by plaintiffs in that case to recharacterize their indirect purchaser claims as direct purchaser claims based solely on the delivery method even though dealers still functioned as intermediaries. Plaintiffs here are not attempting a similar recharacterization because some class member, whether foreign or domestic, purchased vitamin C directly from defendants in every instance with no intermediary.

report is that he included the 6.9 million kilograms of shipments corresponding to the foreign purchaser sales in his damages calculation. Since, however, the Court has not dismissed the foreign purchaser claims, defendants' motion to strike evidence related to these claims is denied.

## V.    Defendants' Motion to Exclude Evidence of Purchases from Co-Conspirators

Separately, defendants have moved to exclude from plaintiffs' damages calculations any purchases made from Shandong Zibo Hualong Co., Ltd. ("Hualong") or Anhui Tiger Biotech Co. ("Tiger"), two non-defendants alleged to be co-conspirators. Defendants argue that plaintiffs have made no showing that these purchases were not made pursuant to contracts containing arbitration clauses and, therefore, that the purchases – which increase plaintiffs' damages by $7.4 million – fall outside the class definition.

Defendants have, essentially, moved for summary judgment on this category of purchases. Although Professor Bernheim admitted at his deposition that he did not establish whether the sales by Hualong and Tiger were made pursuant to contracts with arbitration clauses, defendants have not put forward any evidence that the contracts did, in fact, contain arbitration clauses. Whether these purchases fall outside of the class definition, therefore, remains a fact issue for the jury to determine. The Court is unwilling to dismiss claims for purchases that may very well be proper based solely on defendants' speculation. The fact that Professor Bernheim excluded from his damages calculation purchases made pursuant to known contracts with arbitration clauses where defendants themselves identified the purchases does not change this conclusion. The Court perceives no error in excluding purchases known to fall outside the class definition but retaining purchases that are not known to be improper.

## CONCLUSION

Defendants' motion to dismiss the foreign purchaser claims, strike evidence related to the foreign purchaser claims, and strike evidence of purchases from Hualong and Tiger [533] is denied.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
      November 16, 2012