UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                            :
IN RE VITAMIN C ANTITRUST LITIGATION                        :
                                                            :        06-MD-1738 (BMC) (JO)
-------------------------------------------------------------- :
                                                            :
This document relates to:                                    :
                                                            :
ANIMAL SCIENCE PRODUCTS, INC., et al.,                      :        **MEMORANDUM**
                                                            :        **DECISION AND ORDER**
                    Plaintiffs,                              :
                                                            :        05-CV-0453
v.                                                          :
                                                            :
HEBEI WELCOME PHARMACEUTICAL CO.                            :
LTD., et al.,                                               :
                                                            :
                    Defendants.                             :
                                                            :
-------------------------------------------------------------- X

**COGAN,** District Judge.

       This litigation arises out of allegations that a group of Chinese vitamin C manufacturers

conspired to fix the price of vitamin C at non-competitive levels and to limit the supply of

vitamin C for export to the United States. One of the defendants, North China Pharmaceutical

Group Corp. ("NCPGC"), has moved for summary judgment, arguing that it should be dismissed

from this litigation. For the reasons set forth below, NCPGC's motion for summary judgment is

denied. Separately, plaintiffs have moved to compel NCPGC to conduct an additional search for

documents responsive to plaintiffs' discovery requests. For the reasons set forth below,

plaintiffs' motion to compel is granted in part and denied in part.

## BACKGROUND

       Unlike many of the other defendants in this litigation, NCPGC claims that it is not a

vitamin C manufacturer. Rather, it is an investment holding company that has an indirect

ownership interest in one of the manufacturer defendants, Hebei Welcome Pharmaceutical Co. Ltd. ("Welcome"). NCPGC is owned by the Chinese state.[1] NCPGC owns a share of North China Pharmaceutical Ltd. ("NCPL"), which holds a majority stake in Welcome.

NCPGC, as well as several of its associated entities, previously moved for dismissal from this action. Although the Court dismissed NCPL (as well as North China Pharmaceutical Group International Trade Co., Ltd., another company related to Welcome) for lack of personal jurisdiction, the Court denied NCPGC's motion to dismiss in a Memorandum Decision and Order dated August 7, 2012 (the "August 2012 Decision"). I concluded that the Court had jurisdiction over NCPGC "because plaintiffs have presented enough facts to create an inference that [NCPGC] participated in a price-fixing conspiracy in China which the company reasonably should have expected to have consequences in New York." In reaching this conclusion, the Court relied on plaintiffs' factual averments that NCPGC "exert[ed] unusual control over Welcome." In its summary judgment motion, NCPGC argues that facts that have been developed since the August 2012 Decision demonstrate that there is "no reasonable basis for drawing any inference that [NCPGC] . . . participated in any way in the conspiracy alleged in this case."

First, NCPGC claims that it has no direct ownership stake in Welcome. Rather, it only owns a 27.88% interest in NCPL, a publicly traded company, which in turn, owns shares of Welcome. NCPGC emphasizes that the Court dismissed NCPL from this action in the August 2012 Decision because "plaintiffs [had] presented no evidence that [NCPL] participated in the vitamin C conspiracy." Second, through the testimony of its Deputy General Manager, Yang Jianfu, NCPGC asserts that, as an investor, it was not involved in Welcome's daily operations

---

[1] Specifically, NCPGC is owned by the State-Owned Assets Supervision and Administration Commission of Hebei Province.

2

and had no involvement in the manufacturing or sale of any products, including vitamin C. In fact, NCPGC claims to have had a protocol in place which prevented it from accepting reports from Welcome. Instead, when Welcome sought to consult with a parent, it would communicate with NCPL. According to Yang, NCPGC had no knowledge of Welcome's vitamin C pricing and production practices and had no knowledge of the meetings between Welcome and the other defendants, which form the core of plaintiffs' conspiracy allegations.

The role of Huang Pinqi is central to the issue of whether, and to what extent, NCPGC was involved in and knowledgeable about Welcome's operations and defendants' alleged conspiracy. In addition to being NCPGC's Deputy General Manager during much of the relevant period, Huang was also the chairman of Welcome's board. Huang personally attended meetings of the vitamin C subcommittee of the China Chamber of Commerce of Medicines and Health Products Importers & Exporters (the "Chamber") where the manufacturer defendants allegedly set vitamin C price levels and production volumes. Although the Minutes of these meetings identify Huang as a representative of Welcome and NCPGC stated that none of its agents ever served as president of the Chamber's vitamin C subcommittee, the Court concluded in the August 2012 Decision that plaintiffs "averred facts which, construed in a light most favorable to plaintiffs, show that Mr. Huang – in his role as [NCPGC] Deputy General Manager – conspired with various vitamin C manufacturers to fix the price and limit the supply of vitamin C exported to the United States." The Court grounded its conclusion on an announcement posted on the Chamber's website which stated that the vitamin C subcommittee "decided during a [November 23, 2004] meeting to elect the Deputy General Manager of NCPGC, Mr. Huang Pinqi as the next president of the committee for the year 2005."

3

In this motion, NCPGC characterizes the announcement on the Chamber's website as inadmissible hearsay and argues that, although Huang held positions in both NCPGC and Welcome, all of the evidence shows that Huang participated in Chamber meetings only in his capacity as an officer of Welcome. Qiao Haili, a former Chamber employee who drafted the Chamber's announcement and only became available as a witness subsequent to the August 2012 Decision, stated that NCPGC never "participated in any of the Government-mandated industry coordination meetings conducted under the Chamber's supervision and direction." Yang also testified that "no deputy general managers or leaders from [NCPGC] will function as a rotating chair of that committee" and that the Chamber's announcement likely referred to Huang by his "highest ranking" position – his role at NCPGC – in accordance with Chinese cultural norms of "deference." Finally, NCPGC highlights additional documentary evidence that was not before the Court at the time of the August 2012 Decision, including meeting minutes and the bylaws of the vitamin C subcommittee, which support their argument that it was Welcome, and not NCPGC, that participated in subcommittee meetings.

NCPGC also uses Yang's testimony to argue that a number of documents on which the Court relied in issuing the August 2012 Decision do not, in fact, suggest NCPGC's involvement in Welcome's operations. According to Yang, a "Project Proposal" concerning technological improvements in Welcome's vitamin C manufacturing process was not drafted by NCPGC but was instead prepared by North China Pharmaceutical Group Planning and Design Co. Ltd., "an independent company" that provided the proposal on an arm's length basis. Further, a 2003 Welcome "Work Summary" was addressed to NCPL, not NCPGC.

Lastly, in issuing the August 2012 Decision, the Court relied, in part, on a memorandum summarizing an August 2007 technology symposium organized by NCPGC, which stated that

"[vitamin C] price is extraordinarily high right now, problems probably will arise, and the parties should hold a meeting to coordinate an attempt to reign in the price." The parties have since agreed that the translation of this memorandum that was before the Court at the time of the August 2012 Decision was inaccurate and that the quoted language should instead read: "[vitamin C] price is extraordinarily high right now, problems probably will arise, and it was suggested to hold a coordination meeting to address." According to NCPGC, the correct translation does not suggest any discussion of price controls, let alone one that involved NCPGC.

Plaintiffs, on the other hand, argue – based on many of the same facts – that "there are important issues of disputed fact concerning [NCPGC's] involvement in the Defendants' vitamin C price-fixing conspiracy." In addition to Huang's role as chair of the vitamin C subcommittee and the memo of the August 2007 technology symposium, plaintiffs point to the fact that, once Huang became Deputy General Manager of NCPGC in November 2003, he operated exclusively out of NCPGC's offices, where he received direct reports from Welcome about its vitamin C operations.

Plaintiffs also imply that Huang's description of his role at Welcome while he was chair of the vitamin C subcommittee is inconsistent with his claim that he attended Chamber meetings "in the name of the chairman of the board of the Welcome company." Huang testified that, when he was chairman of Welcome's board during 2005, his duties were limited to going "to Welcome once a year to take part in a board meeting and listen to reports," and "once or twice a year" he would go to Welcome "to look around a bit." Plaintiffs contend that, in light of Huang's limited role at Welcome during this time period, it does not make sense for him to have acted as a representative of Welcome at the subcommittee meetings.

5

Plaintiffs also highlight documents suggesting that NCPGC is, in fact, a vitamin C manufacturer. Chief among these documents is NCPGC's own website, which describes it as a "leading pharmaceutical manufacturer in China[,]" with "output and sales volume of . . . Vitamin C . . . ranking in the forefront of the world." Further, plaintiffs cite a memo summarizing a 2005 Chamber conference which states that "[a]t this conference, the chamber of commerce once again put forward the suggestion of coordinated termination of production. Several manufacturing companies, such as Northeast Pharmaceutical, Shijiazhuang Pharmaceutical and *North China Pharmaceutical* have shown their support to this suggestion[.]" (emphasis added).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted). In an antitrust case, "inferences must be reasonable in light of competing inferences of acceptable conduct." Top Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998).

"[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's

case." <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). On the other hand, in order "[t]o survive summary judgment . . . the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Reiseck v. Universal Commc'ns of Miami</u>, No. 06 Civ. 777, 2012 WL 3642375, at *2 (S.D.N.Y. Aug. 23, 2012) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n.11, 106 S. Ct. 1348, 1355 n.11 (1986)). However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact[,]" <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998), and the "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. <u>Anderson</u>, 477 U.S. at 252, 106 S. Ct. at 2512.

In order to hold a party liable for an antitrust conspiracy, the Second Circuit "require[s] a factual showing that each defendant conspired in violation of the antitrust laws[.]" <u>AD/SAT v. Associated Press</u>, 181 F.3d 216, 234 (2d Cir. 1999). In other words, there must "be some evidence of actual knowledge of, *and participation in*, the illegal scheme[.]" <u>Id</u>. (quoting Vakerics, Antitrust Basics, § 6.13 at 6-37) (emphasis added). And, as NCPGC notes with regard to Huang, "it is a 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership.'" <u>Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.</u>, No. 03 Civ. 377, 2003 WL 21767739, at *3 (S.D.N.Y. July 30, 2003) (quoting <u>United States v. Bestfoods</u>, 524 U.S. 51, 69, 118 S. Ct. 1876 (1998)).

NCPGC's motion is based on the argument that "Plaintiffs can produce no evidence that connects [NCPGC] to a conspiracy to fix the price or quantity of vitamin C exports or establishes that [NCPGC], an investment holding company not engaged in the manufacturing, sale or export of vitamin C, participated in the conspiracy alleged in this case." In addressing the motion, the

7

Court first considers whether certain items may be properly admitted as evidence. Then, the Court assesses whether, based on the admissible evidence, plaintiffs have raised a material issue of fact sufficient to defeat summary judgment.

## II. Evidentiary Issues

Since a district court may only consider admissible evidence in deciding whether to award summary judgment, see Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004), the Court first addresses the admissibility of certain documents that are central to this motion.

### A. The Chamber Website Announcement

The first document is the announcement posted on the Chamber's website which stated that "during the [November 23, 2004 vitamin C subcommittee] meeting, it was decided that Huang Pinqi, deputy general manager of North China Pharmaceutical Group, would be the rotating chair of the Council of the subcommittee for the year 2005" (the "Chamber Website Announcement").[2] Since the Chamber Website Announcement was prepared by the Chamber, a non-party, NCPGC argues that plaintiffs cannot rely on the Chamber Website Announcement to oppose summary judgment because it is inadmissible hearsay. On the other hand, plaintiffs contend that the Chamber Website Announcement falls within the business record exception to the hearsay rule. See generally Fed. R. Evid. 803(6).

Under Rule 803(6), a hearsay record may "be admitted for the truth of the matter asserted if the record was made at or near the time by . . . someone with knowledge; the record was kept in the course of a regularly conducted activity of a business . . . , [and] making the record was a regular practice of that activity." Delaney v. Bank of Am. Corp., __ F. Supp. 2d __, 2012 WL 6135630, at *6 (S.D.N.Y. Dec. 11, 2012) (internal quotation marks omitted). Statements on a

---

[2] The parties refer to this document as Deposition Exhibit 124, or, alternatively, as Trial Exhibit 22.

website can be considered business records within the scope of Rule 803(6).  See generally Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc., No 08-CV-1231, 2009 WL 2500546, at \*9 (E.D. Cal. Aug. 14, 2009) (concluding that statements on a party's website were admissible, despite hearsay objections, under the business records exception and as party admissions). Further, "Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all.'"  United States v. Carneglia, 256 F.R.D. 384, 391 (E.D.N.Y. 2009) (quoting United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000)).

Here, plaintiffs present testimony from former Chamber employee Qiao Haili in order to demonstrate that the Chamber Website Announcement is admissible under Rule 803(6). Specifically, they cite Qiao's testimony that he drafted the Chamber Website Announcement, that he attended the relevant subcommittee meeting, that he regularly kept minutes at these meetings, and that the Chamber had a process for posting the minutes to its website.  NCPGC does not dispute that Qiao wrote the Chamber Website Announcement, but argues that plaintiffs confuse Qiao's testimony.  Although NCPGC is correct that plaintiffs rely largely on testimony relating to (1) subcommittee minutes that were only reported internally to Chamber leadership, not posted on the Chamber's website for the public and (2) other website announcements, that testimony is nonetheless applicable to demonstrate that the process by which the Chamber Website Announcement was created put it within the scope of the business records exception. Through Qiao's testimony plaintiffs have established: (1) that Qiao was present at and kept minutes of the subcommittee meeting at issue as part of his regular practice; (2) that the Chamber kept those minutes as part of its regular practice; (3) that Qiao wrote the Chamber Website Announcement; and (4) that there was a regular process for approving announcements for posting on the Chamber website.

Thus, although the testimony cited by plaintiffs does not directly concern the Chamber Website Announcement at every step, it is sufficient to demonstrate that the Chamber Website Announcement reflects a contemporaneous record made by someone with personal knowledge which was kept through regular business conduct. Consequently, the Chamber Website Announcement satisfies Rule 803(6).[3]

## B. The Aland Documents

Plaintiffs also rely on two documents produced and created by Aland, a defendant that has settled. One document is the memorandum summarizing the August 2007 technology symposium organized by NCPGC (the "Symposium Memo").[4] The second document is a 2005 Aland internal memorandum which states that, at a conference, "[s]everal manufacturing companies, such as Northeast Pharmaceutical, Shijiazhuang Pharmaceutical and North China Pharmaceutical have shown their support to" "the suggestion of coordinated termination of production" (the "Conference Memo").[5] NCPGC argues that the Symposium and Conference Memos constitute inadmissible hearsay.[6] Plaintiffs, on the other hand, contend that these documents are admissible either as business records under 803(6) or, alternatively, as co-conspirator statements under Rule 801(d)(2)(e).[7]

With regard to the business records exception, plaintiffs never deposed the author of the

---

[3] NCPGC's reliance on Aldana v. Del Monte Fresh Produce N.A., Inc., 578 F.3d 1283 (11th Cir. 2009) to argue that "articles, announcement, press releases and the like are not business records" is not persuasive. Although the Aldana court found no case "in which a press release from an Internet website qualified as a business record[,]" id. at 1291 n.3, this Court declines to adopt a categorical rule and sees no reason why an online press release could not constitute a business record, so long as it satisfies all of the requirements of Rule 803(6).

[4] The parties refer to this document as Deposition Exhibit 92, or, alternatively, as Trial Exhibit 17.

[5] The parties refer to this document as Deposition Exhibit 259, or, alternatively, as Trial Exhibit 72.

[6] Defendants have also objected that the Conference Memo is not authenticated and that there is no sponsoring witness for the document.

[7] The Court's inquiry in determining the admissibility of the Symposium and Conference Memos as against NCPGC is related to, but distinct from, the admissibility of these and other Aland documents against defendants generally – a matter on which the Court will rule separately.

Symposium Memo and plaintiffs have not demonstrated that it was Aland's practice to make and retain this particular kind of statement. Although plaintiffs deposed Wang Qiang, the author of the Conference Memo, they did not examine Wang about the Conference Memo or the circumstances of its creation. Thus, plaintiffs have also not demonstrated that it was Aland's practice to make and retain this kind of statement and neither the Symposium nor the Conference Memos are admissible under Rule 803(6).

Under Rule 801(d)(2)(e) a statement "made by [a] party's coconspirator during and in furtherance of the conspiracy" is not hearsay. "The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it[.]" Id. To admit a statement under Rule 801(d)(2)(e), "a district court must find two factors by a preponderance of the evidence. First, that a conspiracy existed that included the declarant and the defendant. Second, that the statement was made during the course and in furtherance of the conspiracy." United States v. Lloyd, 859 F. Supp. 2d 387, 396 (E.D.N.Y. 2012). While the Court can consider the contents of a conspirator's statement, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996).[8]

"The quantum of independent evidence required to satisfy these preliminary requirements is not necessarily onerous." United States v. Saneaux, 392 F. Supp. 2d 506, 511 (S.D.N.Y. 2005) (citing cases). "In cases where the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." Id. at 512 (internal quotation marks omitted). Indeed,

---

[8] Under Rule 104(a), whether the prerequisites for admissibility are satisfied is a preliminary question resolved by the Court.

11

"[t]he proof may be totally circumstantial, and the court must view the evidence as a whole rather than consider individual items in isolation." United States v. Terry, 702 F.2d 299, 320 (2d Cir. 1983) (internal citations omitted). Although defendants are correct that plaintiffs must demonstrate the "likelihood of an *illicit* association between the declarant and the defendant," id. (emphasis in original), courts in the Second Circuit, cognizant of the practicalities of a conspiracy trial, admit co-conspirator statements subject to the later proof of an illegal conspiracy by a preponderance of the evidence. See Park West Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 333 (S.D.N.Y. 2009).

Here, the Conference Memo itself suggests that NCPGC and Aland were both members of the purported conspiracy as it shows that they both participated in the Chamber conference where coordinated termination of vitamin C production was discussed. Further, as is clear from the document's face, the Conference Memo was created in order to analyze the proposed production termination. Thus, the statements in the Conference Memo were made in furtherance of the purported conspiracy.

The Symposium Memo is a weaker piece of evidence because the portion of it that discusses the suggestion of holding a meeting to address high vitamin C prices does not explicitly implicate NCPGC. Nonetheless, there is other evidence on the record, in addition to the Conference Memo, that suggests that both Aland and NCPGC were members of the alleged conspiracy. For example, Welcome sent NCPGC work summaries concerning vitamin C production, NCPGC's own website describes it as a "leading pharmaceutical manufacturer," and, as the Chamber Website Announcement shows, a NCPGC executive, Huang, presided over the subcommittee where many of the discussions underlying the alleged conspiracy took place. Although most of the Symposium Memo was devoted to technological issues, the proposal to

hold a meeting to address the price of vitamin C was undoubtedly in furtherance of the alleged conspiracy to coordinate set prices for vitamin C. Lastly, the Court notes that plaintiffs have proffered evidence that they intend to use at trial to establish the existence of a conspiracy to fix the price and limit the supply of vitamin C at non-competitive levels and to limit the supply of vitamin C for export to the United States. Subject to this proof, the Court finds that, taken together and in light of other corroborating evidence, the Symposium and Conference Memos are admissible against NCPGC under Rule 801(d)(2)(e) and may be considered in connection with the instant summary judgment motion.

## III. Plaintiffs Have Demonstrated Factual Issues Sufficient to Defeat Summary Judgment

Having examined the record before it, including the Symposium and Conference Memos as well as the Chamber Website Announcement, and interpreting the record in the light most favorable to plaintiffs, the Court concludes that plaintiffs carried their burden of demonstrating a genuine dispute of material fact with regard to NCPGC's participation in the alleged conspiracy. Although NCPGC has offered a great deal of evidence that strongly suggests it was not involved in the conspiracy, that evidence is not sufficient to persuade the Court that no reasonable jury could find that NCPGC was a participant in the alleged conspiracy.

First, plaintiffs have called into question NCPGC's description of its own role as an investor rather than a vitamin C manufacturer. NCPGC's own website describes it as a "leading pharmaceutical manufacturer" with "output and sales volume of" vitamin C "ranking in the forefront of the world." Second, the Conference Memo lists NCPGC as one of the "[s]everal manufacturing companies" that supported that Chamber's proposed coordinated production termination. Thus, a reasonable jury could conclude that NCPGC was involved in vitamin C manufacturing.

13

Second, despite NCPGC's arguments, the Court cannot conclude that NCPGC was not involved in Welcome's vitamin C business as a matter of law. Plaintiffs have put before the Court two Work Summary reports from Welcome concerning, among other things, vitamin C production and sales which raise several fact issues. First, the addressee of the reports is disputed. It is not clear whether the reports were sent to NCPGC or NCPL as the name on the reports does not match up perfectly with either entity. NCPGC argues that even if the reports were addressed to it, it had a very strict document protocol that prevented it from receiving such documents from a subsidiary, thus establishing that it was not involved in Welcome's vitamin C business. But a jury may infer that NCPGC played a role in Welcome's business from the mere fact that the reports were directed towards NCPGC, regardless of whether they were received. And although witnesses have speculated that it is "possible" that the reports were sent to Huang in his capacity as a Welcome executive rather than a NCPGC officer, that testimony is speculative and insufficient to support summary judgment.

Third, plaintiffs have also raised a factual issue with regard to whether Huang wore his Welcome hat or his NCPGC hat when participating in meetings of the Chamber's vitamin C subcommittee. NCPGC, for its part, has adduced substantial evidence, including subcommittee minutes and by-laws, to suggest that Huang represented Welcome rather than NCPGC on the subcommittee. NCPGC also has a potentially persuasive response to the Chamber Website Announcement, namely that the title applied to Huang was only honorific. But whether Huang's title in the Chamber Website Announcement was merely an honorific or was accurate is an issue for the jury to decide. And, even if the Court were to discount the Chamber Website Announcement entirely, Huang's own testimony raises a factual issue about his role on the subcommittee. Huang testified that by 2005 – when he had already moved primarily to NCPGC

14

and assumed his role on the subcommittee – his only duties at Welcome were to attended a single board meeting a year and to go to the company "to look around" once or twice a year. Huang did not include attending subcommittee meetings as one of his responsibilities for Welcome. This testimony alone is sufficient to raises an issue as to whether NCPGC, through Huang, participated in the alleged conspiracy through meetings of the subcommittee. The Symposium Memo only reinforces the conclusion that there is evidence from which a jury could conclude that NCPGC participated in the conspiracy at the heart of this litigation.

**IV. Plaintiffs' Motion to Compel NCPGC**

Having determined that NCPGC should not be dismissed from this action at this juncture, the Court turns to plaintiffs' motion to compel. Plaintiffs have asked to Court to compel NCPGC to have its "U.S. counsel perform a thorough, independent search of [NCPGC's] files for all responsive documents from June 2006 through September 2008 . . . including documents pertaining to DSM, Roche or BASF." Plaintiffs argue that they are entitled to this relief because NCPGC's production was deficient and NCPGC failed to adequately preserve, search for, and produce responsive documents. Plaintiffs essentially seek to reopen discovery on the eve of trial, on matters of dubious relevance, and without convincing the Court that NCPGC failed to satisfy its discovery obligations. Accordingly, the Court denies plaintiffs' motion to compel with one exception, as set forth below.

First, with regard to relevance, plaintiffs complain that the only documents that have been received from NCPGC are its articles of incorporation and document retention policy. Missing from this production, according to plaintiffs, are, among other things, documents relating to DSM, Roche and BASF, three European vitamin C manufacturers. NCPGC argues that by focusing on DSM, Roche, and BASF, plaintiffs are attempting to develop new claims not

identified in the pleadings and which have not been at issue during the extensive motion practice in this case. See Fed. R. Civ. P. 26(b)(1) advisory committee's note (observing that the Court "has the authority to confine discovery to the claims and defenses asserted in the pleadings" and that the parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings"). Plaintiffs, however, argue that their complaint contains allegations regarding co-conspirators and these allegations are not restricted to Chinese manufacturers.

NCPGC has the better side of this argument. Although the Third Amended Class Action Complaint does contain allegations about co-conspirators, those allegations do not appear to encompass DSM, Roche, and BASF. Instead, the complaint describes "non-cartel members BASF and DSM (which acquired the interest of Roche)[.]" Thus, the European manufacturers do not appear to be the co-conspirators identified in the pleadings, even if their actions had an effect on vitamin C prices. Further, plaintiffs have not presented the Court with any documents that link NCPGC and the European manufacturers. The undisputed testimony establishes that a contemplated joint venture between NCPGC (or NCPL) and DSM never actually materialized. Although the parties have been conducting discovery in this case for years and trial is imminent, there has been no discovery of the European manufacturers and the parties' proposed joint pretrial order does not encompass issues related to these entities.

In any case, NCPGC searched for documents concerning the European manufacturers, as well as other documents responsive to plaintiffs' requests, and represents that it does not have any responsive documents. Plaintiffs, nonetheless, challenge this representation and argue that they are entitled to further discovery because NCPGC failed to comply with its document preservation and search obligations. With regard to preservation, the law is clear that "[t]he

16

obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation[,]" and that this obligation may arise prior to the filing of a suit if litigation is "reasonably anticipated." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003). Plaintiffs argue that NCPGC violated its duty to preserve because it only instituted a litigation hold in early 2007, when it was named as a party in this action, rather than in 2005 when it became aware of the litigation against Welcome. NCPGC responds that since it is an investment company that does not manufacture or sell vitamin C and has a policy preventing it from accepting documents from Welcome, it had no expectation that it would be named as a defendant or any reasonable belief that it possessed relevant documents.

Plaintiffs have not persuaded the Court that NCPGC failed to satisfy its preservation obligations so as to entitle plaintiffs to the discovery relief they seek. Although NCPGC was unable to show as a matter of law that it did not participate in the alleged anticompetitive conspiracy, the inquiry here is different. Specifically, NCPGC has persuaded the Court that, although it was aware of the litigation in 2005, it did not possess, nor should it reasonably have possessed, a belief that it had documents relevant to the litigation. The Court might be skeptical of NCPGC's claim that it did not believe it had relevant documents despite being aware of the suit against Welcome, but NCPGC's claim is supported by undisputed evidence that, from as early as 2003, NCPGC had in place an archives policy that prevented it from accepting documents from its subsidiaries, including Welcome. Further, all of the Welcome-produced documents that plaintiffs claim are missing from NCPGC's production lack the stamp that, pursuant to NCPGC's archives protocol, would have been affixed to a document sent to NCPGC. NCPGC's claim is also supported by substantial (albeit disputed) evidence that it is an investment entity, not a vitamin C manufacturer, and, thus, it is unlikely to have had responsive

documents in its control.

Moreover, plaintiffs have been afforded full discovery of Huang – the person who
constitutes the alleged link between Welcome and NCPGC and the factual basis for plaintiffs'
claims concerning NCPGC's participation in the alleged conspiracy – including his personal
computer. When this suit was filed in 2005, Welcome instituted a document preservation policy
that encompassed Huang's hard copy and electronic files and records. Thus, this case is different
from Reino de Espana v. Am. Bureau of Shipping, No. 03 Civ. 3573, 2006 WL 3208579
(S.D.N.Y. Nov. 3, 2006), the case on which plaintiffs rely. In Reino, the court reasoned that
"[e]ven if a production request does not specifically address the preservation issue, a party is
obliged to preserve relevant records." Id. at *8. The Reino court granted a motion to compel
because the evidence suggested that "the lack of electronic records is a function of the failure to
adequately preserve evidence, and not an indication that such records simply do not exist." Id.
But the opposite holds true here. For the reasons discussed above, unlike in Reino, the absence
of responsive documents here does not suggest a failure to preserve evidence.

With regard to NCPGC's search for responsive documents, the search methodology
employed by NCPGC appears to have been largely adequate. Once NCPGC was named as a
defendant in 2007, a document preservation protocol was put into place for hard copy and
electronic records covering all relevant custodians. Pursuant to guidance from the U.S. and
Chinese law firms representing it, NCPGC convened a meeting of several department heads and
then performed a search of hard copy and electronic records for responsive documents. IT
personnel utilized two programs to search electronic records and also ran a recovery program to
search deleted files. NCPGC also hired an outside IT contractor to search its electronic records
for responsive documents. Despite these efforts, no responsive documents were located.

18

Plaintiffs argue that NCPGC improperly restricted the scope of its search to 2001 through 2006, rather than up to September 2008, the close of discovery. NCPGC replies that, pursuant to a proper objection, it restricted the period it searched to the damages period in this case. Although the Court might agree with plaintiffs on the merits of the appropriate discovery period, plaintiffs waited too long to raise this objection. Specifically, plaintiffs required NCPGC's corporate representative to travel to the U.S. for deposition concerning document preservation issues despite knowing of NCPGC's objection for two months but did not challenge the objection until after the deposition. Plaintiffs had ample opportunity to challenge NCPGC's objection without imposing an unnecessary burden on NCPGC but chose not to do so. The Court will not allow them to do so now.[9] Although the Court is somewhat troubled by NCPGC's consideration of PX 433, a document reflecting its reaction to the suit against Welcome, as non-responsive to plaintiffs' document requests, plaintiffs received a copy of the same document from Welcome. And, in light of the document's marginal relevance to the matters at the core of this litigation, the Court is not convinced that NCPGC's failure to produce it reflects a fundamental flaw in its production methodology that justifies requiring NCPGC's U.S. counsel to re-do document production at this late stage of the litigation.

The only clear flaw in NCPGC's search methodology is the fact that it appears to have mistakenly searched its electronic records for "BSF" instead of "BASF." Although the Court suspects that re-running the search for "BASF" will be an exercise in futility, doing so should not be too onerous for NCPGC and can be completed quickly. Therefore, NCPGC is directed to

---

[9] Although the Court is somewhat troubled by NCPGC's consideration of PX 433, a document reflecting its reaction to the suit against Welcome, as non-responsive to plaintiffs' document requests, plaintiffs received a copy of the same document from Welcome. And, in light of the document's marginal relevance to the matters at the core of this litigation, the Court is not convinced that NCPGC's failure to produce it reflects a fundamental flaw in its production methodology that justifies requiring NCPGC's U.S. counsel to re-do document production at this late stage of the litigation.

produce to plaintiffs any responsive documents located by searching for "BASF" within 10 days of this Order. Plaintiffs' motion to compel is otherwise denied.

## CONCLUSION

NCPGC's motion for summary judgment [587] is denied. Plaintiffs' motion to compel NCPGC [595] is granted in part and denied in part as set forth above.

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated: Brooklyn, New York
         February 8, 2013