UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
IN RE VITAMIN C ANTITRUST LITIGATION :
: 06-MD-1738 (BMC) (JO)
-------------------------------------------------------------- :
:
This document relates to: :
:
ANIMAL SCIENCE PRODUCTS, INC., et al., : **MEMORANDUM**
: **DECISION AND ORDER**
Plaintiffs, :
: 05-CV-0453
v. :
:
HEBEI WELCOME PHARMACEUTICAL CO. :
LTD., et al., :
:
Defendants. :
:
-------------------------------------------------------------- X

**COGAN,** District Judge.

On March 14, 2013, a jury reached found defendants Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei") and North China Pharmaceutical Group Corp. ("NCPGC")[1] liable to plaintiffs[2] for violating the Sherman Act. Currently before the Court are two post-trial motions. First, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, defendants have renewed their motion for judgment as a matter of law on three grounds. Second, the Injunction Class has moved for an order permanently enjoining defendants from entering into any agreements to fix the price or limit the supply of vitamin C. Familiarity with the facts and procedural history of

---

[1] All other defendants in this action settled either prior to or during trial. The jury's verdict only addressed the liability of Hebei and NCPGC.

[2] The Court certified two plaintiff classes in this action, the Director Purchaser Damages Class and the Injunction Class.

this action is presumed. For the reasons set forth below, defendants' motion is denied and the Injunction Class's motion is granted.

**I. Defendants' Renewed Motion for Judgment as a Matter of Law**

In order to succeed on their renewed motion for judgment as a matter of law, defendants must bear "a heavy burden." Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). A movant can be "awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" Id. (quoting Fed. R. Civ. P. 50(a)(1)). "[T]he district court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007) (internal quotations and alterations omitted). Therefore, where, as here, a "jury has deliberated in the case and actually returned its verdict," the "court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Cash, 654 F.3d at 333 (internal quotation marks omitted). Here, defendants have sought judgment as a matter of law on three grounds. I will address each ground in turn.

    A. <u>Act of State, Foreign Sovereign Compulsion, and International Comity</u>

First, defendants argue that the jury's verdict against them is barred as a matter of law by the doctrines of act of state, foreign sovereign compulsion, and international comity.[3] In essence, defendants contend that the Court's prior rulings that Chinese law did not compel

---

[3] Defendants previously raised these arguments in a motion to dismiss, which was denied by the late Judge Trager, and in a motion for summary judgment, or, alternatively, a motion for a determination of foreign law under Fed. R. Civ. P. 44.1, which I denied.

2

defendants' actions were erroneous and that plaintiffs' claims never should have been brought before a jury. Alternatively, defendants argue that even if it was proper to submit this matter to a jury, the trial was "fatally flawed" by my decision to exclude from the jury copies of Chinese laws and regulations and witness testimony about the meaning and content of those laws. The Court stands by and reaffirms its prior rulings that Chinese law did not compel defendants to engage in antitrust violations, that the doctrines of act of state and international comity do not bar plaintiffs' suit, and that it was inappropriate to present evidence about the meaning of Chinese laws to the jury. Nothing has changed from these pretrial rulings and defendants have stated no additional grounds to revisit them.

Moreover, defendants ignore that one purpose of the trial in this matter was to determine whether, regardless of what Chinese law authorized, defendants' conduct was actually compelled by the Chinese government as a matter of a fact.[4] Therefore, the Court instructed the jury that it was required to return a defense verdict if defendants proved, by a preponderance of the evidence, that the Chinese government actually compelled them to fix the price or limit the supply of vitamin C and defendants have not challenged this instruction.

There was ample evidence presented at trial from which the jury could have found that the Chinese government did not actually compel defendants' decisions to fix the price and limit the supply of vitamin C – including evidence suggesting that the "verification and chop" mechanism did not actually compel defendants to enter into anticompetitive agreements and that the Vitamin C Subcommittee of the Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") was a voluntary trade association. Moreover, in rejecting the compulsion defense, the jury necessarily assessed the credibility of witnesses'

---

[4] The need for a jury to determine whether factual compulsion became even clearer during the trial when several witnesses testified that contemporaneous documents offered as evidence on the compulsion issue – including memoranda addressed to China's Ministry of Commerce – were inaccurate.

testimony and, on a Rule 50(b) motion, the Court may not second-guess those determinations. See Zellner, 494 F.3d at 370. Chinese laws themselves were not placed on trial. Rather, the jury was only required to determine whether the Chinese government acted, not the propriety of its actions.

Nor, despite defendants' suggestion, was it error for the Court to exclude from the jury copies of Chinese laws and regulations and witness testimony about the meaning and content of those laws.[5] Pursuant to Fed. R. Civ. P. 44.1, the determination of foreign law is a question of law. It is for the Court, not for the jury, to decide questions of law and the Court did so when it ruled that, as a matter of law, Chinese law did not compel defendants' conduct. Accordingly, defendants' renewed motion for judgment as a matter of law based on the act of state, foreign sovereign compulsion, and international comity doctrines is denied.

B. NCPGC's Liability

Second, NCPGC seeks judgment as a matter of law dismissing plaintiffs' claims and vacating the jury's verdict against it on the ground that there was insufficient evidence for the jury to find that NCPGC was a member of the anticompetitive conspiracy at issue. NCPGC contends that the overwhelming weight of the evidence demonstrates that it was Hebei, its indirect subsidiary, which participated in the Chamber's vitamin C subcommittee meetings and entered into the relevant agreements, not NCPGC. It points to numerous memoranda summarizing meetings of the Vitamin C Subcommittee which provide no evidence that any NCPGC agents entered into anticompetitive agreements on behalf of NCPGC and it characterizes the evidence on which plaintiffs rely as "limited" and "marginal."

---

[5] Defendants have not sought a new trial because of the Court's exclusion of this supposed evidence.

I previously expressed my doubts concerning the sufficiency of plaintiffs' proof of NCPGC's participation in the conspiracy in the context of defendants' Rule 50(a) motion, but nonetheless denied the motion. Although the evidence adduced by plaintiffs on this issue is hardly overpowering, I cannot conclude that there was a "complete absence of evidence" suggesting NCPGC's participation such that "the jury's findings could only have been the result of sheer surmise and conjecture." Cash, 654 F.3d at 333.

NCPGC attacks several categories of evidence relied on by plaintiffs but, in order to deny NCPGC's motion, I need look no further than the evidence relating to Huang Pinqi. The record shows that Mr. Huang served as Hebei's general manager and later board chairman. In 2003, while Mr. Huang was still serving as Hebei's general manager, he also became the deputy general manager at NCPGC and remained in that position through the relevant time period. It is undisputed that Mr. Huang participated in the meetings of the Vitamin C Subcommittee at which defendants entered into anticompetitive agreements. But, according to defendants, the evidence shows that Mr. Huang participated in those meetings as a representative of Hebei, not NCPGC. Indeed, Qaio Haili, a former Chamber official, testified that Mr. Huang always attended Subcommittee meetings as a Hebei representative and numerous documents regarding Subcommittee meetings describe Mr. Huang as a Hebei representative.

To demonstrate that Mr. Huang also participated in these meetings on behalf of NCPGC, plaintiffs rely on PX 124 – a November 2004 Chamber website announcement of Mr. Huang's election as the chair of the Vitamin C Subcommittee. PX 124 refers to Mr. Huang by his NCPGC title. Both Mr. Huang and Qaio Haili, a former Chamber official, testified that this reference was merely an honorific that does not suggest that Mr. Huang participated in the Chamber on behalf of NCPGC. The persuasiveness of this explanation obviously depends on the

5

credibility of Mr. Huang and Mr. Qaio and, given the fact that these witnesses repeatedly questioned the accuracy of certain contemporaneously created documents, there were ample grounds for the jury to question their credibility.[6]  The jury had every right to credit the documentary evidence over the conflicting testimony from defense witnesses and, in the context of a motion for judgment as a matter of law, it is not appropriate for the Court to second-guess this determination.

Additionally, Mr. Huang never denied attending Subcommittee meetings on behalf of NCPGC and never testified that he only attended these meetings on behalf of Hebei.  Although NCPGC was, of course, not required to disprove its participation, such testimony might have suggested that PX 124 could not support an inference that NCPGC participated in the conspiracy.  Further, Mr. Huang testified that, prior to this election as chair of the Subcommittee, he moved his office from Hebei to NCPGC and, from that point forward, was "seldom" present at Hebei.  The jury reasonably could have inferred that NCPGC participated in Subcommittee meetings at which anticompetitive agreements were entered since, when he participated in those meetings, Mr. Huang was working primarily from NCPGC.  Lastly, plaintiffs produced other evidence, including NCPGC's descriptions of its activities on its website, Hebei reports concerning vitamin C manufacturing sent to NCPGC during the relevant period, and memoranda from a co-conspirator describing NCPGC's support for coordinated termination of vitamin C production.  Although NCPGC criticizes each of these pieces of evidence individually, they were all put before the jury and their cumulative effect cannot be discounted.  In light of PX 124, possible questions about defense witness credibility, and this other supporting evidence, I hold

---

[6] For similar reasons, the jury properly could have discounted Mr. Qiao's testimony that NCPGC was not a member of the Vitamin C Subcommittee and was not eligible to be a member, especially in light of evidence showing that NCPGC participated in an agreement to fix penicillin prices despite being neither a member of the Penicillin Subcommittee nor a penicillin manufacturer.

that there was a sufficient evidentiary basis for the jury to conclude that NCPGC participated in the conspiracy and therefore deny NCPGC's motion.

### C. Reduction of Damages

Third, defendants seek a reduction of the damages award due to the Direct Purchaser Damages Class by $7.5 million ($22.5 million after trebling). According to defendants, this amount corresponds to purchases from two non-defendants alleged to be co-conspirators, Shandong Zibo Hualong Co., Ltd ("Hualong") and Anhui Tiger Biotech Co. ("Tiger"). Defendants contend that plaintiffs failed to prove that the contracts with Hualong and Tiger lacked arbitration clauses, and that if those contracts did have arbitration clauses, then plaintiffs would be relegated to arbitration, and cannot recover damages in this action.[7] Defendants argue that, because of this lack of evidence, the Direct Purchaser Damages Class did not carry its burden of proving this portion of its damages, that the Court improperly shifted the burden of proof on to defendants, and that the jury's award is speculative.

As I said when I denied defendants' Rule 50(a) motion, I think they have this precisely backwards. One can theorize all kinds of contractual provisions that might limit or eliminate the Hualong and Tiger contracts from the calculation of damages – e.g., foreign selection clauses, liability caps, or shortened statutes of limitations. Defendants have seized on the possibility of an arbitration clause in these contracts, but whatever the basis for excluding them from the calculation of damages, it was defendants' burden, not plaintiffs', to show the jury what that basis was. Any provision in those contracts that might have reduced plaintiffs' damage claim was analogous to an affirmative response to plaintiffs' damage theory, and like an affirmative defense, defendants had to point to such provisions. They failed to do so.

---

[7] Pursuant the definition of the certified Direct Purchaser Damages Class, only purchasers who bought vitamin C under contracts without arbitration clauses could recover damages.

7

The Direct Purchaser Damages Class presented expert testimony from Dr. Bernheim estimating the amount of vitamin C purchases falling within the class definition based on U.S. International Trade Commission data and documents produced by the conspirators – documents which demonstrated that Hualong and Tiger were members of the Vitamin C Subcommittee and that their representatives attended meetings with the other conspirators. This evidence satisfied the Class's prima facie burden. If defendants wanted to dispute the Class's damages estimate, it was incumbent upon them to present evidence that the Class's prima facie showing was inaccurate and that certain contracts should have been excluded from the damages award. Defendants attempted to do that through the testimony of their expert, Dr. Wu, who testified that Dr. Bernheim's analysis was flawed.[8] But the jury rejected Dr. Wu's testimony, as evidenced by the award of damages in its verdict, and defendants never offered evidence showing that any contracts with Hualong and Tiger actually contained arbitration clauses. Therefore, I am not convinced that the damages award is impermissibly speculative and I deny defendants' motion to reduce the damages award (or alter or amend the judgment) by $7.5 million ($22.5 million after trebling).

## II. The Motion for a Permanent Injunction

Finally, the Injunction Class seeks a permanent injunction, lasting ten years, against defendants under Section 16 of the Clayton Act, which authorizes the district courts to issue "injunctive relief . . . against threatened loss or damages by a violation of the antitrust laws." 15 U.S.C. § 26. The parties agree that the determination of whether to issue an injunction is governed by the four-part test set forth in eBay Inc. v. MerchExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837 (2006). Under that test, "a plaintiff seeking a permanent injunction must . . . .

---

[8] Defendants, however, never cross-examined Dr. Bernheim concerning his decision to include Tiger and Hualong sales in his damages estimate.

demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. at 391, 126 S. Ct. at 1839. I address each requirement in turn.

First, with regard to irreparable injury, in order to obtain a Section 16 injunction, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S. Ct. 1562, 1580 (1969). Here, the Injunction Class has already proven injury, as demonstrated by the jury verdict. Defendants argue that the jury verdict only applies to the class period – December 2001 through June 2006 – and that there is no evidence that the anticompetitive conspiracy is continuing. But that argument is unpersuasive. See In re Data Gen. Corp. Antitrust Litig., MDL Dkt. No. 369, 1986 WL 10899, at * (N.D. Cal. July 30, 1986) (imposing an injunction despite the observation that "a permanent injunction almost by definition must rest on outdated facts").

Moreover, there is evidence that anticompetitive conduct is likely to recur if not enjoined. Documentary evidence indicates that the conspirators discussed performing future actions "in a more hidden and smart way" and testimony established that, after this lawsuit was filed, conspirators stopped keeping notes of their meetings. Defendants have not renounced their conduct and they continue to contest their liability. See Coleman v. Cannon Oil Co., 849 F. Supp. 1458, 1472 (M.D. Ala. 1993) (issuing a permanent injunction in an antitrust case where, among other things, defendants "failed to acknowledge their wrong-doing").

For the indirect purchasers, who comprise the vast majority of Injunction Class members, the injury they already suffered and any similar injury they are likely to suffer in the future is irreparable. Indirect purchasers of vitamin C cannot bring a federal claim for damages, see generally Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061 (1977), and many also lack a state law-based cause of action for damages. Further, "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to . . . measure, or that it is a loss that one should not be expected to suffer." Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010). It undoubtedly would be difficult to measure the injury that anticompetitive conduct would cause indirect vitamin C purchasers and no Injunction Class member should be expected to suffer injury as a result of illegal anticompetitive conduct. Accordingly, I conclude that the first eBay factor is satisfied.

For many of the same reasons, I conclude that the Injunction Class does not have an adequate remedy at law and the second eBay factor is satisfied. As noted, many indirect vitamin C purchasers cannot bring any claim for damages if defendants engage in further anticompetitive conduct. Further, even direct purchasers are only entitled to damages equal to the overcharge paid for vitamin C as a result of illegal conduct. As the eight-year (and still ongoing) history of this action attests, prosecuting international antitrust claims are difficult, costly, and time-consuming. Should defendants recommence their anticompetitive conduct, the Injunction Class will have to incur considerable expense in order to vindicate its rights.

With regard to the third eBay factor, the balance of hardships, contrary to defendants' contention, the injunction sought is neither "drastic" nor "extraordinary." It prohibits agreements "to fix the price or limit the supply of vitamin C sold in the United States in violation of Section 1 of the Sherman Act." In other words, all the injunction does is prohibit defendants from

10

committing what, independently, would constitute an illegal act.  See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S. Ct. 811, 841 (1940) ("[T]his Court has consistently and without deviation adhered to the principle that price-fixing arrangements are unlawful per se under the Sherman Act.").  Mandating compliance with the law can hardly be considered burdensome.  And, as discussed, the Injunction Class would have to incur considerable expense if it had to vindicate its rights through another litigation.  Thus, I conclude that the balance of hardships favors the injunction.

      Finally, the fourth eBay factor concerns the public interest.  Civil damages suits to enforce the antitrust laws are unquestionably in the public interest.  See Zenith, 395 U.S. at 133, 89 S. Ct. at 1582 ("[T]reble-damage cases, which are brought for private ends, . . . also serve the public interest in that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.") (internal quotation marks omitted).  Defendants contend that a permanent injunction "would interfere with the Chinese government's sovereign authority and its ability to regulate its own domestic affairs."  This argument ignores the fact that the jury found defendants liable based on voluntary, uncompelled conduct.  If, in the future, the operation of the permanent injunction comes into conflict with China's sovereign regulatory authority, defendants, or any other enjoined party, may seek to have the injunction vacated or limited on that basis.  However, the Court will not deny the Injunctive Class relief to which it is otherwise entitled on the basis of speculative and uncertain future interference with the regulatory authority of another nation.  Therefore, I conclude that a permanent injunction is in the public interest and that the Injunction Class is entitled to the permanent injunction it seeks.

## CONCLUSION

Defendants' renewed motion for judgment as a matter of law [688] is denied and the Injunction Class's motion for a permanent injunction [693] is granted. An Amended Judgment and Decree will issue by separate order.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
November 25, 2013